HULL, Circuit Judge:
In 1996 state habeas proceedings, Warren Lee Hill, Jr. unsuccessfully alleged that he is mentally retarded and ineligible *1337 for the death penalty. Hill, a Georgia death row inmate, was able to raise this claim in 1996, well before the Atkins decision[1] was issued in 2002, because in 1988 the State of Georgia led the nation by abolishing the death penalty for mentally retarded defendants. See O.C.G.A. § 17-7-131 (1988 statute prohibiting death penalty where defendant proves mental retardation beyond reasonable doubt).
Although Georgia already prohibited executing mentally retarded defendants at the time of Hill’s trial, direct appeal, and initial state habeas petition, Hill did not claim he was mentally retarded until five years after his 1991 trial. In 1996, Hill amended his state habeas petition to allege mental retardation for the first time, and he later claimed that Georgia’s reasonable doubt standard of proof in O.C.G.A. § 17-7-131 violated the Eighth Amendment.
The national consensus against executing the mentally retarded that gave birth to the Atkins prohibition was a consensus that Georgia started by enacting the very same statute — § 17-7-131(e)(3), (j) — that petitioner Hill now claims violates Atkins by using a reasonable doubt standard. In Hill’s state habeas appeal in 2003, and after Atkins, the Georgia Supreme Court held that the reasonable doubt standard in § 17-7-131 comports with the Eighth and Fourteenth Amendments. Head v. Hill, 277 Ga. 255, 587 S.E.2d 613, 621-22 (2003) (“Hill III ”). The Georgia Supreme Court recently reaffirmed its holding in Hill III that Georgia’s beyond a reasonable doubt standard for proving mental retardation is constitutional. See Stripling v. State, 289 Ga. 370, 711 S.E.2d 665, 668 (2011) (“We have previously addressed this very issue, and we now reiterate our prior holding that Georgia’s beyond a reasonable doubt standard is not unconstitutional.”) (citing Hill III, 587 S.E.2d at 620-22).
In this appeal under the Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”), codified in 28 U.S.C. § 2254, the sole legal issue before this en banc court is:
Pursuant to AEDPA’s § 2254(d)(1), is the Georgia Supreme Court’s decision in Head v. Hill, 277 Ga. 255, 587 S.E.2d 613, 620-22 (2003) — that Georgia’s statutory reasonable doubt standard for capital defendants’ mental retardation claims does not violate the Eighth Amendment — contrary to clearly established federal law, as announced in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)?[2]
In § 2254 cases, federal courts do not review state courts’ decisions de novo. Rather, Congress restricted federal review to whether the state court’s decision is “contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States” as of the date of the state court decision. 28 U.S.C. § 2254(d)(1) (emphasis added). Discussing § 2254(d)(1) specifically, and reversing federal circuit courts for granting habeas relief, the Supreme Court has admonished: “A legal principle is ‘clearly established’ within the meaning of this provision only when it is embodied in a holding of this [Supreme] Court.” Thaler v. Haynes, 559 U.S. -, 130 S.Ct. 1171, 1173, 175 L.Ed.2d 1003 (2010); see Berghuis v. *1338 Smith, 559 U.S. -, 130 S.Ct. 1382, 1392, 1395-96, 176 L.Ed.2d 249 (2010). AEDPA established a “highly deferential standard for evaluating state-court rulings.” Renico v. Lett, 559 U.S. -, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010).
As the Georgia Supreme Court correctly noted, there is no holding in Atkins, or any Supreme Court decision, invalidating a reasonable doubt standard for mental retardation claims. Just the opposite is true. Atkins expressly left it for the states to develop the procedural and substantive guides for determining who is mentally retarded. Bobby v. Bies, 556 U.S. 825, 129 S.Ct. 2145, 2150, 173 L.Ed.2d 1173 (2009). And in the 219-year history of our nation’s Bill of Rights, no United States Supreme Court decision has ever suggested, much less held, that a burden of proof standard on its own can so wholly burden an Eighth Amendment right as to eviscerate or deny that right.[3] Because there is no specific, much less “clearly established” by Supreme Court precedent, federal rule regarding the burden of proof for mental retardation claims, AEDPA mandates that this federal court leave the Georgia Supreme Court decision alone — even if we believe it incorrect or unwise — and affirm in this case. See Harrington v. Richter, 562 U.S. -, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011) (“It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a. specific legal rule that has not been squarely established by this Court.” (brackets and quotation marks omitted)); Lett, 130 S.Ct. at 1862 (“We have explained that ‘an unreasonable application of federal law is different from an incorrect application of federal law.’ ”).
I. BACKGROUND
It is important to the burden of proof issue that the whole story of this case be told. So we start at the beginning.

A. Mental Retardation and the Death Penalty

In 1988, the Georgia General Assembly passed the nation’s first statute prohibiting the execution of mentally retarded persons. Specifically, O.C.G.A. § 17-7-131(c)(3) and (j) state:
[A criminal] defendant may be found “guilty but mentally retarded” if the jury, or court acting as trier of facts, finds beyond a reasonable doubt that the defendant is guilty of the crime charged and is mentally retarded. If the court or jury should make such finding, it shall so specify in its verdict.
In the trial of any case in which the death penalty is sought which commences on or after July 1, 1988, should the judge find in accepting a plea of guilty but mentally retarded or the jury or court find in its verdict that the defendant is guilty of the crime charged but mentally retarded, the death penalty shall not be imposed and the court shall sentence the defendant to imprisonment for life.
O.C.G.A. § 17-7-131(c)(3), (j) (emphasis added).
One year later, in Penny v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the United States Supreme Court concluded that the Eighth Amend *1339 ment did not prohibit the execution of the mentally retarded.[4] The Supreme Court noted that, as of that time, “[o]nly one State ... currently bans execution of retarded persons who have been found guilty of a capital offense.” Id. at 334, 109 S.Ct. at 2955 (citing Georgia’s O.C.G.A. § 17-7-131(j)).
Then in 2002, the United States Supreme Court overruled Penry in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and declared that the Eighth Amendment’s “cruel and unusual punishment” provision prohibited the execution of mentally retarded offenders. Id. at 315-21, 122 S.Ct. at 2249-52.
Although the Supreme Court in Atkins recognized a national consensus against executing mentally retarded persons, it said that there was a notable lack of consensus on how to determine which offenders are mentally retarded:
To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded .... Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus.
Atkins, 536 U.S. at 317, 122 S.Ct. at 2250. The Supreme Court added that although the states’ “statutory definitions of mental retardation are not identical, [they] generally conform to the clinical definitions” established by the American Association on Mental Retardation (“AAMR,” now known as the American Association on Intellectual and Developmental Disabilities) and the American Psychiatric Association (“APA”). Atkins, 536 U.S. at 317 n. 22, 122 S.Ct. at 2250 n. 22. The AAMR’s and APA’s definitions of mental retardation contain three basic requirements: (1) significantly sub-average general intellectual functioning, as reflected by an IQ generally about 70 or below; (2) limitations in adaptive functioning; and (3) onset before age 18. Id. at 308 n. 3,122 S.Ct. at 2245 n. 3.
In Atkins, the Supreme Court was careful not to fix the burden of proof or to impose rigid definitions of mental retardation. Instead, the Court left it to the states to develop “appropriate” procedures for mental retardation determinations:
As was our approach in Ford v. Wain-might, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), with regard to insanity, we leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences.
Id. (quotation marks and brackets omitted). As the Georgia Supreme Court noted in Hill III, the Supreme Court in Atkins “made clear that it was entrusting the states with the power to develop the procedures necessary to enforce the newly recognized federal constitutional ban.” Hill III, 587 S.E.2d at 620 (citing Atkins, 536 U.S. at 317,122 S.Ct. at 2250).
Later, in Bobby v. Bies, 556 U.S. 825, 129 S.Ct. 2145, 173 L.Ed.2d 1173 (2009), the Supreme Court pointed out that Atkins “did not provide definitive procedural or substantive guides for determining *1340 when a person who claims mental retardation ‘will be so impaired as to fall within Atkins’ compass.’ ” 129 S.Ct. at 2150 (brackets omitted). In its 2009 Bies decision, the Supreme Court repeated that Atkins had “left to the States the task of developing appropriate ways to enforce the constitutional restriction” on executing the mentally retarded. Id. (brackets omitted).
We turn to how the Georgia reasonable doubt statute and Atkins intersect with Hill’s ease.

B. Facts and Procedural History

In 1990, while Hill was serving a life sentence for the murder of his girlfriend, he murdered another person in prison. Using a nail-studded board, Hill bludgeoned a fellow inmate to death in his bed. As his victim slept, “Hill removed a two-by-six board that served as a sink leg in the prison bathroom and forcefully beat the victim numerous times with the board about the head and chest as onlooking prisoners pleaded with him to stop.” Hill III, 587 S.E.2d at 618. Hill “mocked the victim as he beat him.” Id. Even locked up in jail for one murder, Hill continued to kill.
A jury unanimously convicted Hill of malice murder and unanimously imposed a death sentence. See Hill v. State, 263 Ga. 37, 427 S.E.2d 770, 774 (1993) (“Hill J”). Despite the fact that O.C.G.A. § 17-7-131(c)(3) and (j) already exempted mentally retarded persons from execution at the time of Hill’s trial, Hill did not assert at trial that he was mentally retarded. To the contrary, Hill called clinical psychologist William Dickinson, who testified that Hill’s IQ was 77 and he was not mentally retarded.
On direct appeal in 1993, the Georgia Supreme Court affirmed Hill’s malice murder conviction and death sentence. Hill I, 427 S.E.2d at 772. On direct appeal, Hill made no claim of mental retardation.
In 1994, Hill filed a state habeas petition. Again he made no mental retardation claim. But five years after trial, Hill amended his petition to allege, inter alia, that he is mentally retarded. In 1997, the state habeas court granted Hill a writ of habeas corpus for the limited purpose of conducting a jury trial on Hill’s mental retardation claim, using a preponderance of the evidence standard.
The State appealed, and the Georgia Supreme Court reversed. Turpin v. Hill, 269 Ga. 302, 498 S.E.2d 52 (1998) (“Hill II”).[5] The Georgia Supreme Court concluded that § 17-7-131’s requirement that a defendant prove his mental retardation beyond a reasonable doubt applies to all defendants tried after the statute’s effective date in 1988. Id. at 53-54. The Georgia Supreme Court remanded Hill’s case to the state habeas court to determine, without a jury, whether Hill could establish under the reasonable doubt standard that he is mentally retarded. Id.
On remand, the state habeas court ordered mental evaluations, conducted an evidentiary hearing, and then denied all of Hill’s claims. In a May 2002 order, the state habeas court concluded that Hill had not proven he was mentally retarded un *1341 der the reasonable doubt standard. The state habeas court employed the definition of mental retardation in O.C.G.A. § 17-7-131(a)(3), which provides that “mentally retarded” means (1) having “significantly subaverage general intellectual functioning,” (2) “resulting in or associated with impairments in adaptive behavior,” (3) “which manifested during the developmental period.” Georgia’s definition essentially tracks the AAMR and APA definitions mentioned in Atkins.[6]
As to the first prong, the state habeas court found that Hill established beyond a reasonable doubt his “significantly subaverage general intellectual functioning.”[7]
As to the second prong, however, the state habeas court found Hill failed to show beyond a reasonable doubt that he had “impairments in adaptive behavior” such as “communication, self-care, home living, social/interpersonal skills, use of community resources, self direction, functional academic skills, work, leisure, health, and safety.” The state habeas court noted Hill’s (1) extensive work history and “apparent ability to function well in such employment,” (2) disciplined savings plans to purchase cars and motorcycles, (3) military service, (Jf) social life, (5) weak but sufficient writing skills, (6) ability to care for himself in home living except in periods of stress, and (7) health problems with seizures. The state habeas court did not discuss the third prong of the mental retardation test, which is onset before age 18.
After the Supreme Court issued Atkins in June 2002, Hill moved the state habeas court to reconsider its denial in light of Atkins. Granting Hill’s motion, the state habeas court in November 2002 concluded that a preponderance of the evidence standard should be applied to Hill’s mental retardation claim. Although the state habeas court did not retreat from its earlier finding that Hill failed to show he was mentally retarded under the reasonable doubt standard, the court stated it would *1342 find Hill to be mentally retarded under the preponderance of evidence standard.
The State appealed. In 2003 the Georgia Supreme Court again reversed the state habeas court. See Hill III, 587 S.E.2d at 618. The Georgia Supreme Court concluded: (1) Hill could have had a jury trial on mental retardation under O.C.G.A. § 17 — 7—131(c)(3) at the time of his original guilt trial in 1991 if he had asked for one, but he waived that right; (2) Hill was only entitled to have the state habeas court — not a jury — assess his mental retardation claim;[8] (3) Atkins applied retroactively, but Atkins entrusted to the states the task of developing procedures to enforce the ban on executing the mentally retarded; (4) “nothing in Atkins instructs the states to apply any particular standard of proof to mental retardation claims”; and (5) the Supreme Court’s decision in Leland, v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), which upheld as constitutional the reasonable doubt standard for insanity claims, supported Georgia’s reasonable doubt standard in Hill’s case. Hill III, 587 S.E.2d at 619-21.
The Georgia Supreme Court concluded that Georgia’s reasonable doubt standard was constitutionally acceptable for mental retardation claims. Id. The Georgia Supreme Court explained that O.C.G.A. § 17-7-131’s reasonable doubt standard reflected an acceptable state legislative choice to define as mentally retarded those defendants who are able to prove their mental retardation beyond a reasonable doubt:
[A] higher standard of proof serves to enforce the General Assembly’s chosen definition of what degree of impairment qualifies as mentally retarded under Georgia law for the purpose of fixing the appropriate criminal penalty that persons of varying mental impairment should bear for their capital crimes .... [T]he Court in Atkins recognized that, despite a “national consensus” against executing mentally retarded persons, there might be “serious disagreement ... in determining which offenders are in fact retarded.” In view of the lack of national consensus as to which mentally impaired persons are constitutionally entitled to an exemption from death sentences, we conclude that the Georgia General Assembly ... was originally and remains within constitutional bounds in establishing a procedure for considering alleged mental retardation that limits the exemption to those whose mental deficiencies are significant enough to be provable beyond a reasonable doubt.
Id. at 622 (citations omitted). The Georgia Supreme Court vacated the state habeas court’s November 2002 order (granting Hill’s motion for reconsideration and finding that Hill had established he was mentally retarded by a preponderance of the evidence). Id. at 623. The Georgia Supreme Court remanded Hill’s case to the state habeas court for entry of an order denying Hill’s state habeas petition. See id. at 618, 622-23. On remand, the state habeas court reinstated its May 2002 order, finding Hill failed to prove mental retardation beyond a reasonable doubt. The state habeas court’s final order does not contain a preponderance of the evidence finding either way.
In 2004, Hill filed a § 2254 petition, alleging that Georgia’s reasonable doubt standard for mental retardation violates the Eighth and Fourteenth Amendments. The district court denied relief. Hill ap *1343 pealed. A panel of this Court reversed, and we granted en banc rehearing and vacated the panel opinion. Hill v. Schofield, 625 F.3d 1313 (11th Cir.), vacating Hill v. Schofield, 608 F.3d 1272 (11th Cir. 2010). As stated earlier, the sole question before the en banc Court is whether the Georgia Supreme Court’s decision in Hill III — holding that Georgia’s reasonable doubt standard does not violate the Eighth Amendment — “is contrary to clearly established federal law, as announced in Atkins.”
II. STANDARD OF REVIEW
Hill’s § 2254 petition and appeal are governed by AEDPA. Owen v. Sec’y, Dep’t of Corn., 568 F.3d 894, 907 (11th Cir.2009), cert. denied, — U.S. -, 130 S.Ct. 1141, 175 L.Ed.2d 978 (2010). “Under AEDPA, our review of a final state habeas decision is ‘greatly circumscribed and is highly deferential to the state courts.’ ” Payne v. Allen, 539 F.3d 1297, 1312 (11th Cir.2008) (quoting Crawford v. Head, 311 F.3d 1288, 1295 (11th Cir.2002)). Under 28 U.S.C. § 2254(d)(1), as amended by AEDPA, a state prisoner cannot obtain federal habeas relief unless he can show the decision of the state court “was contrary to, or involved an unreasonable application of, clearly established Federal law....” 28 U.S.C. § 2254(d)(1) (emphasis added). In this case, the only question is whether the Georgia Supreme Court’s decision — that the reasonable doubt standard for mental retardation claims is constitutional — is “contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” Id.[9]
In 2010-11 alone, the Supreme Court has reversed circuit appellate courts in ten decisions for not adhering to AEDPA’s requirements. See Bobby v. Dixon, 565 U.S. -, 132 S.Ct. 26, 181 L.Ed.2d 328 (2011); Bobby v. Mitts, 563 U.S. -, 131 S.Ct. 1762, 179 L.Ed.2d 819 (2011); Cullen v. Pinholster, 563 U.S. -, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011); Felkner v. Jackson, 562 U.S. -, 131 S.Ct. 1305, 179 L.Ed.2d 374 (2011); Premo v. Moore, 562 U.S. -, 131 S.Ct. 733, 178 L.Ed.2d 649 (2011); Richter, — U.S. -, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011); Lett, — U.S. -, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010); Berghuis, — U.S. -, 130 S.Ct. 1382, 176 L.Ed.2d 249 (2010); Haynes,— U.S. -, 130 S.Ct. 1171, 175 L.Ed.2d 1003 (2010); Smith v. Spisak, 558 U.S. -, 130 S.Ct. 676, 175 L.Ed.2d 595 (2010). We briefly review a few of those decisions.
Starting with Haynes, the Supreme Court instructed: “A legal principle is ‘clearly established’ within the meaning of this provision only when it is embodied in a holding of this Court.” Haynes, 130 S.Ct. at 1173 (citing Carey v. Musladin, 549 U.S. 70, 74, 127 S.Ct. 649, 653, 166 L.Ed.2d 482 (2006); Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000)) (emphasis added); see also Owen, 568 F.3d at 907 (“ ‘Clearly established Federal law’ means the holdings, not the dicta, of the United States Supreme Court.”).
In Haynes, the Supreme Court unanimously reversed the Fifth Circuit’s decision, which had concluded that a state court judge in ruling on a Batson challenge must reject a demeanor-based explanation for a challenge unless that judge personally observed and recalls the aspect of the prospective juror’s demeanor on *1344 which the explanation is based. Haynes, 130 S.Ct. at 1172. After the Texas appellate court denied state habeas relief, the Fifth Circuit concluded that Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and Snyder v. Louisiana, 552 U.S. 472, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008), “clearly established” that rule and on that basis granted federal habeas relief. Id. at 1173-74. In Snyder, the Supreme Court actually had (1) stressed that when the explanation for a peremptory challenge “invoke[s] a juror’s demeanor,” the trial judge’s “first hand observations” are of “great[ ] importance,” and (2) pointed out that the peremptory challenge (based on nervousness) was not exercised until some time after the juror was questioned and the state trial judge might not have recalled that juror’s demeanor. Snyder, 552 U.S. at 477, 479, 128 S.Ct. at 1208-09. Despite Batson and Snyder, the Supreme Court in Haynes concluded the Fifth Circuit “read far too much into those decisions” and “no decision of this Court clearly establishes the categorical rule on which the [Fifth Circuit] Court of Appeals appears to have relied.” Haynes, 130 S.Ct. at 1172, 1175.
A month later, in Berghuis v. Smith, the Supreme Court unanimously reversed the Sixth Circuit’s decision, which had concluded that in determining whether a jury venire was drawn from a fair cross-section of the community, “courts should use the comparative disparity test to measure underrepresentation” where the allegedly excluded group is small, and the defendant’s comparative disparity statistics demonstrate that African-Americans’ representation in the County Circuit Court venires is “unfair and unreasonable.” Berghuis, 130 S.Ct. at 1391 (citing Smith v. Berghuis, 543 F.3d 326, 338 (6th Cir.2008)). In granting federal habeas relief after the Michigan Supreme Court had denied relief, the Sixth Circuit relied on Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).[10]
Reversing the Sixth Circuit, the United States Supreme Court stated, “[0]ur Duren decision hardly establishes — no less ‘clearly’ so — that Smith was denied his Sixth Amendment right to an impartial jury drawn from a fair cross section of the community.” Berghuis, 130 S.Ct. at 1392. The Supreme Court added: “[N]either Duren nor any other decision of this Court specifies a method or test courts must use to measure the representation of distinctive groups in jury pools.” Id. at 1393.
In Lett, the Supreme Court again reversed a Sixth Circuit decision concluding that the Michigan Supreme Court had unreasonably applied Supreme Court precedent regarding the Double Jeopardy Clause. 130 S.Ct. at 1860. The Supreme Court stated:
We have explained that an unreasonable application of federal law is different from an incorrect application of federal law. Indeed, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established fed *1345 eral law erroneously or incorrectly. Rather, that application must be objectively unreasonable. This distinction creates a substantially higher threshold for obtaining relief than de novo review. AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt.
Id. at 1862 (citations and quotation marks omitted). The Supreme Court emphasized that “AEDPA prevents defendants — and federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.” Id. at 1866.
Richter concerned a Ninth Circuit decision holding that the California Supreme Court had unreasonably applied the Supreme Court’s Strickland v. Washington ineffective-counsel test by not concluding that the petitioner’s trial counsel was ineffective for failing to consult with blood-evidence experts. Richter, 131 S.Ct. at 783. In reversing, the Richter Court lectured the court of appeals on the deference owed to state court decisions pursuant to § 2254(d)(1):
A state court’s determination that a claim lacks merit precludes federal habeas relief so long as “fairminded jurists could disagree” on the correctness of the state court’s decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).... “[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.” Knowles v. Mirzayance, 556 U.S. Ill, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).
... It bears repeating that even a strong case for relief does not mean the state court’s contrary conclusion was unreasonable. See Lockyer, supra, at 75, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144.
If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. Cf. Felker v. Turpin, 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA’s “modified res judicata rule” under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court’s decision conflicts with this Court’s precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a “guard against extreme malfunctions in the state criminal justice systems,” not a substitute for ordinary error correction through appeal. Jackson v. Virginia, 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court’s ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.
The reasons for this approach are familiar. “Federal habeas review of state convictions frustrates both the States’ sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.” Calderon v. Thompson, 523 U.S. 538, 555-556, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998) (internal quotation marks omitted). It “disturbs the State’s significant interest in repose *1346 for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority.” [Harris v.] Reed, 489 U.S. [255], at 282, 109 S.Ct. 1038 [103 L.Ed.2d 308] (KENNEDY, J., dissenting).
Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions.
Richter, 131 S.Ct. at 786-87 (emphasis added). Phrased “more simply and maybe a little more clearly: if some fairminded jurists could agree with the state court’s decision, although others might disagree, federal habeas relief must be denied.” Loggins v. Thomas, 654 F.3d 1204, 1220 (11th Cir.2011).
And in Moore, as in Richter, the Supreme Court reversed a Ninth Circuit decision finding that a state court had unreasonably applied Strickland. Moore, 131 S.Ct. at 737-39. The Supreme Court took issue particularly with the court of appeals’ conclusion that the state court’s decision— that Moore’s counsel was not ineffective for failing to file a motion to suppress before advising Moore to plead guilty— was contrary to Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Fulminante was not an ineffective assistance of counsel case, and because it did not speak to Strickland’s prejudice standard or contemplate prejudice in the plea bargain context, the state court’s “finding of constitutionally adequate performance under Strickland cannot be contrary to Fulminante.” Moore, 131 S.Ct. at 743. The Supreme Court emphasized that the court of appeals’ decision “transposed [Fulminante] into a novel context; and novelty alone — at least insofar as it renders the relevant rule less than ‘clearly established’ — provides a reason to reject it under AEDPA.” Id.
In another recent case reversing the en banc Ninth Circuit’s grant of § 2254 habeas relief, the Supreme Court admonished again that AEDPA’s § 2254(d)(1) standard “is a difficult to meet” and “highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt” and that “the petitioner carries the burden of proof.” Pinholster, 131 S.Ct. at 1398. The California Supreme Court had summarily denied petitioner Pinholster’s penalty-phase ineffective assistance claim in state habeas proceedings “ ‘on the substantive ground that it is without merit.’ ” Id. at 1396-97, 1402. The Supreme Court reversed the en banc determination that the California Supreme Court had unreasonably applied Strickland, concluding that the federal court of appeals had not applied the requisite AEDPA deference to the California Supreme Court’s decision. Id. at 1401-11.
Then in Dixon, the Supreme Court reversed a Sixth Circuit decision concluding that the Ohio Supreme Court had, among other things, unreasonably applied Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), when it found that the petitioner’s murder confession was voluntary. Dixon, 2011 WL 5299458, No. 10-1540, slip op. at 4-6. The Supreme Court noted that, under AEDPA, “a state prisoner seeking a writ of habeas corpus from a federal court ‘must show that the state court’s ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement’ ” Id., slip op. at 1 (quoting Richter, 131 S.Ct. at 786-87) (emphasis *1347 added). The United States Supreme Court concluded that “[b]ecause it is not clear that the Ohio Supreme Court erred at all, much less erred so transparently that no fairminded jurist could agree with that court’s decision, the Sixth Circuit’s judgment must be reversed.” Id. (emphasis added).
These seven § 2254(d)(1) habeas decisions emphasize that (1) petitioner Hill must show a “clearly established” federal law in the form of a United States Supreme Court holding before this Court can find a Georgia Supreme Court decision unreasonable, and (2) this Court cannot find that highest state court’s habeas decision unreasonable unless “no fairminded jurist could agree with that [state] court’s decision.” Dixon, slip op. at 1. This AEDPA “standard of ‘contrary to, or involving an unreasonable application of, clearly established Federal law1 is ‘difficult to meet,’ because the purpose of AEDPA is to ensure that federal habeas relief functions as a ‘guard against extreme malfunctions in the state criminal justice systems,’ and not as a means of error correction.” Greene v. Fisher, 565 U.S. -, 132 S.Ct. 38, 181 L.Ed.2d 336 (2011) (quoting Richter, 131 S.Ct. at 786 (internal quotation marks, citation, and brackets omitted)).[11]
III. DISCUSSION
Hill does not challenge the state habeas court’s finding that Hill has not shown he is mentally retarded beyond a reasonable doubt. The AEDPA “deference due is heavy and purposely presents a daunting hurdle for a habeas petitioner to clear.” Loggins, 654 F.3d at 1220. Rather, he contends that the Georgia Supreme Court’s Hill III decision upholding Georgia’s statutory reasonable doubt standard is contrary to the holding in Atkins. Hill’s position is that Georgia’s statute (which was at the vanguard of the “national consensus” leading the Supreme Court to abolish the execution of the mentally retarded in Atkins) is now unconstitutional under the authority of Atkins — even though Atkins does not require any specific burden of proof and explicitly leaves such procedural matters to the states. For several reasons, Hill “read[s] far too much into” Atkins, and other cases he cites for that matter. Haynes, 130 S.Ct. at 1172.

A Atkins Left Procedural Rules to States

First, the Supreme Court in Atkins made no reference to, much less reached a holding on, the burden of proof. See Haynes, 130 S.Ct. at 1173; Owen, 568 F.3d *1348 at 907. To the contrary, the Supreme Court in Atkins noted the lack of agreement as to how mental retardation is to be determined and expressly left the procedures for doing so to the states.[12] 536 U.S. at 317, 122 S.Ct. at 2250; see also Holladay v. Allen, 555 F.3d 1346, 1353 (11th Cir.2009) (“[T]he [Supreme] Court left to the states the development of standards for determining when an offender is mentally retarded.”). Therefore, Atkins provides no support for Hill’s or the dissents’ argument.
Atkins’s decision to leave the task to the states not only renders the federal law not “clearly established,” but also makes it “wholly inappropriate for this court, by judicial fiat, to tell the States how to conduct an inquiry into a defendant’s mental retardation.” In re Johnson, 334 F.3d 403, 405 (5th Cir.2003) (noting that Atkins explicitly left the procedures governing its implementation to the states).[13]
In Bies, the Supreme Court in 2009 reaffirmed that “[its] opinion [in Atkins] did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation ‘will be so impaired as to fall [within Atkins’ compass.]’ ” Bies, 129 S.Ct. at 2150. Bies thus makes it clear that Atkins did not prescribe the burden of proof. Bies even reiterated that Atkins “left to the States the task of developing appropriate ways to enforce the constitutional restriction.” Id.[14]
Atkins simply did not consider or reach the burden of proof issue, and neither has any subsequent Supreme Court opinion. We do not gainsay the possibility that the Supreme Court may later announce that a reasonable doubt standard for establishing the mental retardation exception to execution is constitutionally impermissible. But under AEDPA, we are not concerned with *1349 what a United States Supreme Court holding could or should be in the future, but only what holdings of the Supreme Court established the law to be at the time the Georgia Supreme Court decided Hill III in 2003.

B. Beyond a Reasonable Doubt Standard Upheld for Insanity Defense

Second, in the absence of any Supreme Court burden of proof holding in mental retardation execution cases, the Georgia Supreme Court reasonably looked to the Supreme Court’s insanity decisions in Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952) (rejecting due process challenge to reasonable doubt standard for establishing insanity plea), and Ford v. Wainwright, ATI U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (recognizing Eighth Amendment prohibits execution of insane persons and allowing states to decide ways to enforce that constitutional restriction). The Georgia Supreme Court determined, inter alia, that “a mental retardation claim is comparable to a claim of insanity” in that “both relieve a guilty person of at least some of the statutory penalty to which he would otherwise be subject.” Hill III, 587 S.E.2d at 621. Both Leland and Ford lend enough support to the Georgia Supreme Court’s decision that we cannot say “no fairminded jurist could agree with that court’s decision.” Dixon, 132 S.Ct. 26.
At the time of Leland, Oregon was the only state that required a defendant to establish a plea of insanity beyond a reasonable doubt. Nonetheless, in Leland the Supreme Court determined that that fact was not dispositive and that Oregon’s reasonable doubt standard for insanity pleas was constitutional, stating:
Today, Oregon is the only state that requires the accused, on a plea of insanity, to establish that defense beyond a reasonable doubt. Some twenty states, however, place the burden on the accused to establish his insanity by a preponderance of the evidence or some similar measure of persuasion. While there is an evident distinction between these two rules as to the quantum of proof required, we see no practical difference of such magnitude as to be significant in determining the constitutional question we face here. Oregon merely requires a heavier burden of proof .... The fact that a practice is followed by a large number of states is not conclusive in a decision as to whether that practice accords with due process, but it is plainly worth considering in determining whether the practice offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.
Leland, 343 U.S. at 798, 72 S.Ct. at 1007 (footnote, quotation marks, and citation omitted) (emphasis added).[15] The Leland Court noted that a defense of insanity lessened one’s culpability, which is the same basis used for Eighth Amendment protection in Atkins. Id. at 796-97, 72 S.Ct. at 1006-07; see Atkins, 536 U.S. at 316, 318, 122 S.Ct. at 2249, 2250-51 (stating, “our society views mentally retarded offenders as categorically less culpable than the average criminal,” and “[tjheir deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability”).
*1350 And further, in Ford, as in Atkins, the Supreme Court refused to impose any particular burden of proof on the fight of the insane not to be executed and left “to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.” 477 U.S. at 416-17, 106 S.Ct. at 2605 (plurality opinion). In Ford, a majority of the Supreme Court first held that the Eighth Amendment prohibited execution of insane persons. Then, in a portion of the lead opinion garnering plurality support, the Supreme Court stated that “[i]t may be that some high threshold showing on behalf of the prisoner will be found a necessary means to control the number ofnonmeritorious or repetitive claims of insanity.” Id. at 417, 106 S.Ct. at 2605 (emphasis added).[16]

C. Hill’s Cooper Argument

Hill relies on Cooper v. Oklahoma, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996), which held that an Oklahoma law that required a defendant to prove incompetence to stand trial by clear and convincing evidence violated the Due Process Clause. Id. at 366-69, 116 S.Ct. at 1383-84. In Hill III, the Georgia Supreme Court reasonably concluded that the insanity cases of Leland and Ford are more closely analogous to the burden of proof standard in Georgia’s mental retardation statute than is the mental incompetency case of Cooper. See Hill III, 587 S.E.2d at 621-22.
First, Cooper emphasized that (1) the Supreme Court had historically and consistently recognized that “the criminal trial of an incompetent defendant violates due process”; and (2) the historical common law standard of proof for incompetency in both English and American cases was preponderance of the evidence. Cooper, 517 U.S. at 354-56, 116 S.Ct. at 1376-77 (emphasis added). In contrast, there is no historical right (in the Eighth Amendment or elsewhere) of a mentally retarded person not to be executed. And since the constitutional right itself is new, there is no historical tradition regarding the burden of proof as to that right. As recently as 1989, Penry refused to bar the execution of the mentally retarded. Atkins was based not on historical tradition or the Due Process Clause, but on the contemporary national consensus that reflected “the evolving standards of decency” that informed the meaning of the Eighth Amendment. Atkins, 536 U.S. at 311-12, 122 S.Ct. at 2247. Indeed, Georgia’s reasonable doubt standard for establishing a mental retardation exception to the death penalty, which was enacted twenty-three *1351 years ago, is the oldest such law in the nation. Although other states recently have employed either clear and convincing evidence or preponderance of evidence standards, no more lenient standard of proof predates Georgia’s. Thus, Cooper’s due process analysis does not help Hill’s Eighth Amendment claims under Atkins.

D. Hill’s Argument that Georgia’s Standard Undermines Atkins

Hill argues that (1) Atkins prohibits the execution of mentally retarded persons, (2) a person who meets the preponderance of the evidence standard is more likely than not mentally retarded, and (3) thus Georgia’s reasonable doubt procedural rule impermissibly burdens and effectively undermines the Eighth Amendment substantive right of the mentally retarded not to be executed.
As noted earlier, in the 219-year history of our nation’s Bill of Rights, no Supreme Court decision has ever held, or even implied, that a burden of proof standard on its own can so wholly burden an Eighth Amendment right as to eviscerate or deny that right. Because there is no “clearly established” federal law supporting Hill’s position, AEDPA mandates that we not overturn the Georgia Supreme Court’s denial of Hill’s constitutional challenge to Georgia’s statutory reasonable doubt standard.[17] See Berghuis, 130 S.Ct. at 1391-92; Haynes, 130 S.Ct. at 1173.
Atkins itself does not support Hill’s argument. Atkins did not bestow a substantive Eighth Amendment right to a fixed and rigid definition of “mentally retarded persons.” Indeed, various states use different definitions of intellectual functioning (some draw the line at an IQ of 75 or below, some at 70 or below, others at 65 or below)[18] and consider different factors in *1352 assessing adaptive functioning. Atkins itself acknowledged that the states’ “statutory definitions of mental retardation are not identical,” though they “generally conform to the clinical definitions” set forth by the APA and AAMR. Atkins, 536 U.S. at 317 n. 22,122 S.Ct. at 2250 n. 22.
It is undisputed that Georgia’s statutory definition of mental retardation is consistent with the clinical definitions cited in Atkins. Compare O.C.G.A. § 17-7-131(a)(3), with Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. at 2245 n. 3. Thus, contrary to the dissents’ contentions, this is not a case about the categorical exclusion of the mildly mentally retarded or any other group from the Atkins prohibition. Instead, it is about Georgia’s procedure for determining who is mentally retarded, which is a matter distinct from the Eighth Amendment issue decided in Atkins. See Atkins, 536 U.S. at 317, 122 S.Ct. at 2250; cf. Walker v. True, 399 F.3d 315, 319 (4th Cir.2005) (“While Walker’s claim ultimately derives from his rights under the Eighth Amendment, whether he is mentally retarded is governed by Virginia law.”). To argue otherwise is to argue that federal courts, not the states, have the responsibility under Atkins for promulgating the procedures that will be used to determine mental retardation.
In any event, because Atkins never said, or even hinted at (much less held), what procedures are or are not “appropriate” for implementing the prohibition Atkins recognized, Atkins cannot possibly provide “clearly established” federal law for Hill’s claims. To accept Hill’s argument would require us not only to abandon the deference AEDPA demands, but also to ignore the clear language of Atkins itself about who is to decide what procedures are to be used to determine mental retardation.[19]
Additionally, Hill focuses on Georgia’s burden of proof procedure and ignores the many other procedural protections afforded under Georgia’s statute and processes. Looking solely to one aspect of Georgia’s procedures, without placing them in context, is inconsistent with Ford, where the Supreme Court evaluated Florida’s process as a whole.[20]
*1353 Georgia’s process, when evaluated as a whole, contains substantial procedural protections.[21] The Georgia statute allows a defendant to raise the issue of mental retardation in the guilt phase of his criminal trial and permits a jury to find a defendant guilty but mentally retarded. O.C.G.A. § 17 — 7—131(c)(8). This has two significant advantages. The jury does not hear the criminal history that is allowed in the penalty phase, and it is not informed that a guilty but mentally retarded verdict will preclude the death penalty. See King v. State, 273 Ga. 258, 539 S.E.2d 783, 798 (2000) (“[A] jury should not be informed that a finding of mental retardation bars the imposition of the death penalty.”); Heidler v. State, 273 Ga. 54, 537 S.E.2d 44, 55 (2000) (“[I]n the guilt-innocence phase, the trial court should not inform the jury that the defendant will not receive a death sentence if he is found guilty but mentally retarded.”).
Georgia law also guarantees Hill the right: (1) not to be sentenced to death except by unanimous verdict, with no judicial override possible; (2) to a full and fair plenary trial on his mental retardation claim, as part of the guilt phase of his capital trial; (3) to present his own experts and all other relevant evidence; (4) to cross-examine and impeach the State’s experts and other witnesses; (5) to have a neutral factfinder (the jury, if Hill had elected to have mental retardation decided during the guilt phase, and a judge if otherwise) decide the issue; (6) to question prospective jurors about their biases related to mental retardation; (7) to have jurors decide mental retardation without being informed that a finding of mental retardation precludes the death penalty and without being informed of the defendant’s criminal record; (8) to orally argue before the factfinder; and (9) to appeal any adverse mental retardation determination. Within the bounds of evidentiary admissibility, there is virtually no limit to the evidence a Georgia defendant can present in support of his mental retardation claim. Thus, the reasonable doubt standard is but one aspect of a multifaceted fact-finding process under Georgia law. This is not to say what the ultimate outcome of the constitutional issue may or should be in future non-AEDPA cases, but only illustrates further how Hill’s challenge to the burden of proof standard should not be viewed in isolation.[22]
As did the Atkins Court, Justice Powell’s concurring opinion in Ford made clear the refusal to clearly establish any precise limit on a state’s fact-finding procedures for determining the insanity bar to execution, aside from a few core due process rights. See Ford, 477 U.S. at 427, 106 *1354 S.Ct. at 2610 (Powell, J., concurring in part and concurring in the judgment) (“The State should provide an impartial officer or board that can receive evidence and argument from the prisoner’s counsel, including expert psychiatric evidence that may differ from the State’s own psychiatric examination. Beyond these basic requirements, the States should have substantial leeway to determine what process best balances the various interests at stake.” (emphasis added)).
The Supreme Court in Atkins, as in Ford, announced an Eighth Amendment prohibition on executions in specified circumstances but never purported to decide or prescribe how states should procedurally implement that prohibition. Atkins left the states substantial leeway in enacting procedures to determine whether a capital defendant is exempt from execution because he is mentally retarded. And Georgia has exercised that leeway by setting the IQ level at 70, by affording a capital defendant the multiple and significant rights outlined above, and by determining that the risk of error due to malingering or other factors is substantial and that there is a need for a robust burden of proof. This potential for malingering is evidenced in this case (1) where Hill’s initial expert (clinical psychologist William Dickinson) initially testified Hill had an IQ of 77 and was not mentally retarded, and (2) even though Georgia provided a mental retardation bar to execution since 1988, Hill never claimed mental retardation at trial, on direct appeal, or in his first state habeas petition. In fact, the state habeas record documents Hill’s (1) extensive work history and ability to function well; (2) disciplined savings plans to purchase cars and motorcycles; (3) military service; and (4) active social life. This is not to diminish the critical importance of the Atkins right not to be executed if mentally retarded. It is only to say that the Georgia Supreme Court’s decision was not contrary to “clearly established” federal law and for that reason AEDPA bars our reversing it.

E. Hill’s Risk of Error Argument

Hill argues that Georgia’s burden of proof statute will inevitably result in the execution of some mentally retarded defendants because they might be able to prove they are mentally retarded by a preponderance of the evidence but not beyond a reasonable doubt. From this Hill extrapolates that the beyond a reasonable doubt standard is contrary to Atkins because it will result in the execution of some offenders who are mentally retarded but cannot prove it beyond a reasonable doubt. There are fundamental flaws in Hill’s argument.
First, Hill’s risk of error argument, like his other claims, ignores the fact that Atkins disavowed any intent to establish a nationwide procedural or substantive standard for determining mental retardation. See Atkins, 536 U.S. at 317, 122 S.Ct. at 2250; Bies, 129 S.Ct. at 2150. Notably too, Hill isolates Georgia’s burden of proof standard and ignores all of the many other procedures in Georgia law favorable to a defendant, as outlined above, that assist a jury in accurately determining whether a defendant is mentally retarded.
Second, Hill’s risk of error inquiry asks and answers the wrong question. Instead of asking whether the decision of the Georgia Supreme Court was contrary to clearly established federal law as determined by the Supreme Court, it asks whether, under de novo review, the Georgia procedural requirement goes as far as it could to enforce the substantive constitutional prohibition the Supreme Court announced in Atkins. Because the Supreme Court has never considered that question, or even a similar one, it is necessarily a *1355 matter of first impression. Such de novo inquiry is precisely what a federal habeas court cannot, and should not, do. A federal court may not grant habeas relief on a claim a state court has rejected on the merits simply because the state court held a view different from its own. See Mitchell v. Esparza, 540 U.S. 12, 17, 124 S.Ct. 7, 11,157 L.Ed.2d 263 (2003).
A third critical flaw in Hill’s argument is that a risk of error exists with any burden of proof. Every standard of proof allocates some risk of an erroneous factual determination to the defendant and therefore presents some risk that mentally retarded offenders will be executed in violation of Atkins. The adjudication of all facts always involves a “margin of error ... which both parties must take into account.” In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970) (quotation marks omitted). In any proceeding to determine whether a defendant is mentally retarded, and no matter what the burden of proof, “the trier of fact will sometimes, despite his best efforts, be wrong in his factual conclusions.” Id. at 370, 90 S.Ct. at 1076 (Harlan, J., concurring).
Two kinds of fact determination risks are possible when an offender alleges that he is mentally retarded. See id. at 370-71, 90 S.Ct. at 1076. The first is that the trier of fact will conclude that the offender is mentally retarded when, in fact, he is not. The second is that the trier of fact will conclude that the offender is not mentally retarded when, in fact, he is.
Although the preponderance of the evidence standard may present a smaller risk of the latter kind of error, even under that standard there is a risk that the trier of fact will erroneously conclude that an offender is not mentally retarded when, in fact, he is. Consequently, under Hill’s reasoning, even a preponderance of the evidence standard will result in the execution of those offenders that Atkins was designed to protect because it does not eliminate the risk that the trier of fact will conclude that the offender is not' mentally retarded when, in fact, he is. It only decreases the risk of that kind of erroneous conclusion. That necessarily would mean that those 28 states that require the defendant to prove mental retardation either by clear and convincing evidence (Arizona, Colorado, Delaware, Florida, and North Carolina) or by a preponderance of the evidence standard (23 states) have violated the Eighth Amendment because there will always be some risk of error in those two standards. The necessary result of Hill’s reasoning is that the burden of proof must be placed on the state and that the state must prove beyond any doubt that an offender is not mentally retarded. No state uses that standard. The effective result of Hill’s argument, then, is that every state’s death penalty statute or case law procedure is unconstitutional because none of them requires the state to prove the absence of mental retardation beyond a reasonable doubt. Or, to take Hill’s argument to its logical conclusion, beyond all doubt.
Indeed, under the reasoning Hill employs, virtually any state rule that allocates to the defendant at least some risk that the trier of fact will erroneously conclude that he is not mentally retarded would be insufficient to enforce the constitutional prohibition of Atkins. All kinds of rules serve to allocate the risk of an erroneous decision — procedural rules that determine who can participate in the presentation of evidence and argument, evidentiary rules that determine what evidence the trier of fact can consider, and decisional rules like the standard of proof at issue here. See Alex Stein, Constitutional Evidence Law, 61 Vand. L.Rev. 65, 67-68 (2008). Taken *1356 literally, the logic on which Hill relies would invalidate any rule that allocates to the defendant some risk of an erroneous conclusion about a defendant’s mental retardation. Cf Patterson v. New York, 432 U.S. 197, 208, 97 S.Ct. 2319, 2326, 53 L.Ed.2d 281 (1977) (“Punishment of those found guilty by a jury ... is not forbidden merely because there is a remote possibility in some instances that an innocent person might go to jail.”).
And there is no reason to limit the insistence that all risk of error be borne by the state just to mental retardation cases. If Hill’s no-risk reasoning is accepted, it would give rise to similar claims about determining insanity and competency to be executed. After all, unless the state is required to rule out those two mental conditions beyond all doubt, there will be, as Hill’s argument goes, some who are convicted and punished, even executed, although they were insane at the time of the crime, see Leland, 343 U.S. at 790, 72 S.Ct. at 1002, or were mentally incompetent at the time of the execution, see Ford, 477 U.S. at 399,106 S.Ct. at 2595. There is no end to the position that Hill espouses.
Fourth, there is no evidence in this record to support the proposition that the reasonable doubt standard triggers an unacceptably high error rate for mental retardation claims. Whether a burden of proof scheme will result in an unacceptably high error rate is, in part, an empirical question that we are ill-equipped to measure in the first instance. There is no data on this question in this record.

F. Dissent’s Reported Cases

In an effort to circumvent this lack of any evidence on the error rate, one dissent cites 22 reported capital cases in Georgia where mental retardation claims were raised. Infra, at 89-91 (Dissenting opinion of Barkett, J.). The dissent argues that out of those cases, “only one defendant has ever successfully established his mental retardation beyond a reasonable doubt.” Id. at 90. The dissent argues that this “confirms just how extraordinarily difficult it is for an offender to meet the beyond a reasonable doubt standard.” Id. at 89. Those purported statistics and that reasoning are faulty for multiple reasons.
First, the 22 case statistics. We note that: (1) in 5 of the 22 cases cited by the dissent, the defendant received a life sentence, not a death sentence, see Foster v. State, 283 Ga. 47, 656 S.E.2d 838 (2008); Torres v. State, 272 Ga. 389, 529 S.E.2d 883 (2000); Lyons v. State, 271 Ga. 639, 522 S.E.2d 225 (1999); Mosher v. State, 268 Ga. 555, 491 S.E.2d 348 (1997); Williams v. State, 262 Ga. 732, 426 S.E.2d 348 (1993); (2) in one of the cases, Heidler v. State, the defendant admitted at trial that he introduced no evidence he was mentally retarded and told the jury it had nothing to consider as to mental retardation, 273 Ga. 54, 63, 537 S.E.2d 44, 55 (2000); (3) in another of the cases, Foster v. State, the defendant’s conviction was reversed because the trial court failed to charge the jury on the statutory definition of mental retardation, 283 Ga. 47, 49-50, 656 S.E.2d 838, 841 (2008); (4) in another of the cases, Head v. Stripling, the Georgia Supreme Court affirmed the state habeas court’s order granting habeas relief and ordering a retrial on mental retardation because the State suppressed evidence favorable to the defendant’s mental retardation claim, 277 Ga. 403, 407-10, 590 S.E.2d 122, 126-28 (2003); and (5) in two of the cases, Morrison v. State, 276 Ga. 829, 830, 583 S.E.2d 873, 875 (2003), and Rogers v. State, 282 Ga. 659, 659, 653 S.E.2d 31, 34 (2007), the defendants were granted a trial on mental retardation under a preponderance standard, which they failed to meet. That leaves only 13 report *1357 ed mental retardation capital cases (including Hill’s) from 1988 to 2011.
Second, the dissent’s focus on only reported appellate decisions skews its analysis. The dissent overlooks the fact that in Georgia mental retardation is tried in the guilt phase of capital cases, not the penalty phase. When a Georgia capital defendant is found guilty but mentally retarded, he automatically obtains a life sentence and (1) may not appeal at all, or (2) may appeal as to issues that do not require discussion of the mental retardation issue, which was decided in his favor. Also unreflected in the dissent’s data are cases where a defendant offers evidence of mental retardation, but also proves he is innocent of the crime, thereby obtaining a verdict of not guilty (instead of guilty but mentally retarded), precluding any appeal. And, of course, defendants who have substantial evidence of mental retardation may plead guilty but mentally retarded, with the State’s acquiescence, and not appear in the reported appellate decisions for that reason. The dissent’s listing of 18 reported cases where a death sentence was imposed far from captures the universe of mental retardation issue cases. That Georgia has had the mental retardation bar for 23 years and the dissent can cite only 13 reported cases of a defendant not prevailing, if anything, suggests just the opposite of the dissent’s proposition.
Third, the dissent proffers no evidence that the defendants in those 13 reported cases actually are mentally retarded, or would be found to be mentally retarded under a preponderance of the evidence standard. There is no evidence at all of that.
Fourth, even if one were to consider the dissent’s skewed data, the fact remains that reported cases in Georgia actually show that judges and juries do find defendants guilty but mentally retarded under Georgia’s proof beyond a reasonable doubt standard. See, e.g., Hall v. Lewis, 286 Ga. 767, 692 S.E.2d 580 (2010) (defendant convicted of murder and sentenced to death; trial court in state habeas held defendant had proven his mental retardation beyond a reasonable doubt and found trial counsel ineffective for not investigating and presenting evidence of defendant’s mental retardation at guilt/innocence phase); Walker v. State, 282 Ga. 774, 782, 653 S.E.2d 439, 447 (2007), abrogated on other grounds by Ledford v. State, 289 Ga. 70, 85, 709 S.E.2d 239, 254, cert. denied, — U.S. -, 132 S.Ct. 556, 2011 WL 4344614 (Nov. 7, 2011) (defendant convicted and sentenced to death, but in doing proportionality review, the Georgia Supreme Court’s opinion stated that defendant’s co-defendant Griffin was sentenced to life and “has been adjudicated mentally retarded, making him ineligible for a death sentence”); Marshall v. State, 276 Ga. 854, 583 S.E.2d 884 (2003) (defendant charged with malice murder but convicted of felony murder and involuntary manslaughter; jury found defendant guilty but mentally retarded as to felony murder and involuntary manslaughter); Chauncey v. State, 283 Ga.App. 217, 641 S.E.2d 229 (2007) (after bench trial, judge found defendant guilty but mentally retarded on eight charges of aggravated child molestation and aggravated sodomy); Laster v. State, 234 Ga.App. 16, 505 S.E.2d 560 (1998) (jury found defendant guilty but mentally retarded on charge of first-degree arson); Moody v. State, 205 Ga.App. 376, 422 S.E.2d 70 (1992) (jury found defendant guilty but mentally retarded on charges of child molestation and aggravated child molestation). All of those cases are examples of defendants being found mentally retarded under the proof beyond a reasonable doubt standard the dissent implies precludes such a finding.

*1358
G. The Dissents and Procedural Due Process

Because the United States Supreme Court has never stated, in Atkins or elsewhere, that a reasonable doubt standard for mental retardation violates the Eighth Amendment, the dissents attempt to avoid this pivotal fact by making what are, in effect, procedural due process arguments. The primary dissent argues that Georgia’s burden of proof procedure, in practical operation, eviscerates the substantive Eighth Amendment right under Atkins. Infra, at 76 (Dissenting opinion of Barkett, J.). The dissent states that “the question before the Supreme Court of Georgia was whether Georgia’s burden of proof eviscerates the substantive constitutional right of the mentally retarded not to be executed” under Atkins. Id. In this regard, the dissent argues that: (1) “Georgia ... cannot indirectly authorize the execution of mentally retarded offenders through a procedure that in practical operation accomplishes that result”; and thus (2) the Georgia Supreme Court’s approval of the beyond a reasonable doubt standard for mental retardation claims is contrary to clearly established federal law, as announced by the Supreme Court in Bailey v. Alabama, 219 U.S. 219, 31 S.Ct. 145, 55 L.Ed. 191 (1911), and Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). Infra, at 76, 92 (Dissenting opinion of Barkett, J.).
Although this en banc case and the Georgia Supreme Court decision under scrutiny are about the Eighth Amendment, the separate procedural due process provenance of this dissent’s argument is evident from the Bailey and Speiser cases upon which it relies. Neither Bailey nor Speiser are Eighth Amendment cases (or capital cases, or mental retardation cases). Bailey concerned a Thirteenth Amendment challenge to a state statute criminalizing the breach of a personal service contract. Bailey, 219 U.S. at 227, 245, 31 S.Ct. at 146, 153. Speiser resolved a First Amendment and Fourteenth Amendment challenge to a state tax exemption scheme that required applicants to prove they did not advocate the overthrow of the government. Speiser, 357 U.S. at 514-17, 78 S.Ct. at 1336-37. The Speiser Court stated specifically that “[t]he question for decision ... is whether [the state’s] allocation of the burden of proof, on an issue concerning freedom of speech, falls short of the requirements of due process.” Id. at 523, 78 S.Ct. at 1341.[23]
But the wholly separate issue of procedural due process under the Due Process Clause, however formulated, is not in the case before us. Rather, this case is about Hill’s substantive constitutional right under the Eighth Amendment. It is telling that the parties never mentioned either Bailey or Speiser in their briefs to the Georgia Supreme Court.
By attempting to transpose the holdings of Bailey (a Thirteenth Amendment case) and Speiser (a First Amendment case) into the Eighth Amendment context, the dissent makes the same error the Supreme Court identified in Moore. In Moore, as *1359 discussed above, the Supreme Court reversed a court of appeals’ decision — that a state court unreasonably applied the Strickland ineffective assistance of counsel standard — that relied on a case, Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), which did not involve ineffective assistance of counsel. See Premo v. Moore, 131 S.Ct. at 737-39, 743. The Supreme Court stated that the court of appeals, to reach its conclusion that the state court decision was an unreasonable application of Strickland, “transposed [.Fulminante] into a novel context; and novelty alone — at least insofar as it renders the relevant rule less than ‘clearly established’ — provides a reason to reject it under AEDPA.” Id. at 743. The Georgia Supreme Court’s decision in Hill III, like the state court decision discussed in Moore, was not “contrary to,” and did not “involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1) (emphasis added).

H. Panetti and Procedural Due Process

The two other dissents in this case, (Dissenting opinions of Wilson, J., and Martin, J.), rely primarily on Panetti v. Quarter-man, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007), which addressed the petitioner’s (1) incompetence-to-be-executed claim and (2) his argument that the state court failed to provide the minimum procedural due process requirements of Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). Panetti, 551 U.S. at 948, 127 S.Ct. at 2855.
Panetti (1) does not involve Atkins or mental retardation, (2) does not discuss burdens of proof, and (3) was issued four years after the Georgia Supreme Court’s decision in Hill III. Each factor alone, and certainly collectively, is sufficient to demonstrate Panetti’s inadequacy for showing that the Georgia Supreme Court’s decision in Hill III is contrary to, or an unreasonable application of, clearly established federal law.
But there is something more. Panetti, if anything, shows why Hill’s claim fails here. Panetti relied on the prior decision of Ford, which had announced both a substantive Eighth Amendment right and a specific procedural due process requirement under the Due Process Clause for incompetency claims: the petitioner must have an opportunity to present evidence and argument. See Ford, 477 U.S. at 424-25, 106 S.Ct. at 2609 (concurring opinion of Powell, J.) (stating that “the question in this case is whether Florida’s procedures for determining petitioner’s sanity comport with the requirements of due process,” finding Florida’s procedures do not require the factfinder to consider the petitioner’s materials, and concluding they thus deprive the prisoner of an “opportunity to be heard”); see also Panetti, 551 U.S. at 948-49, 127 S.Ct. at 2855-56 (noting Ford “identifies the measures a State must provide when a prisoner alleges incompetency to be executed,” “sets the minimum procedures a State must provide to a prisoner raising a Ford-based competency claim,” and “constitutes ‘clearly established’ law for purposes of § 2254”).
As to the minimum procedures for incompetence-to-be-executed claims, Ford announced that the “basic [procedural] requirements” include an opportunity to submit “evidence and argument from the prisoner’s counsel, including expert psychiatric evidence that may differ from the State’s own psychiatric examination.” Ford, 477 U.S. at 427, 106 S.Ct. at 2610 (concurring opinion of Powell, J.). In Panetti, the state court appointed its own experts but did not give petitioner Panetti an “opportunity to submit expert evidence in re *1360 sponse to the report filed by the court-appointed experts,” an error “that Ford makes clear is impermissible under the Constitution.” Panetti, 551 U.S. at 950-51, 127 S.Ct. at 2857. The state court’s adjudication in Panetti thus violated the specific legal procedure required by Ford.[24]
Panetti is a straightforward application of AEDPA. The Court in Panetti concluded that: (1) Supreme Court precedent in Ford clearly established not only the substantive Eighth Amendment right not to be executed if incompetent but also certain minimum procedural due process guidelines under the Due Process Clause for bringing the substantive claim, and (2) the state court procedures afforded Panetti did not satisfy Ford’s procedural requirement of an opportunity to present expert evidence. Here, by contrast, Atkins established only a substantive Eighth Amendment right for the mentally retarded, not any minimum procedural due process requirements for bringing that Eighth Amendment claim. Importantly too, Panetti does not mention the burden of proof at all and thus did not establish federal law as to the burden of proof. Thus, the Georgia Supreme Court’s decision about the burden of proof cannot be contrary to, or an unreasonable application of, the controlling Supreme Court precedent in Atkins, or Panetti for that matter. AEDPA does not permit us, as the dissents’ approach would have us do, to import a procedural burden of proof requirement into Atkins (that expressly declined to adopt one) from Panetti (that did not mention the burden of proof), and then find that a state’s preexisting procedural standards are an unreasonable application of that imported standard.
IV. CONCLUSION
Even if the State of Georgia has somehow inappropriately struck the balance between two competing interests in § 17-7-131(c)(3), and even if the Georgia Supreme Court’s decision upholding that statute is considered incorrect or unwise by a federal court, AEDPA precludes a federal court from imposing its will, invalidating that state statute as unconstitutional, and granting federal habeas relief in the absence of “clearly established” federal law, which the United States Supreme Court admonishes is a holding of that Court. There is no United States Supreme Court case holding that a reasonable doubt burden of proof for claims of mental retardation violates the Eighth Amendment. Atkins did not ask or answer that question.
Whether we agree with the Georgia Supreme Court or not, AEDPA requires us to affirm the denial of Hill’s § 2254 petition. We do not decide whether Georgia’s burden of proof is constitutionally permissible, but only that no decision of the United States Supreme Court clearly establishes that it is unconstitutional. Simply put, Hill has failed to show “that no fair-minded jurist could agree” with the Georgia Supreme Court’s decision about the burden of proof, and thus this Court is “without authority to overturn the reasoned judgment of the State’s highest court.” Dixon, 132 S.Ct. 26.
*1361 If the standard of proof Georgia has adopted for claims of mental retardation is to be declared unconstitutional, it must be done by the Supreme Court in a direct appeal, in an appeal from the decision of a state habeas court, or in an original habeas proceeding filed in the Supreme Court, see Felker v. Turpin, 518 U.S. 651, 662-63, 116 S.Ct. 2333, 2339, 135 L.Ed.2d 827 (1996) (leaving open the question whether AED-PA’s restrictions apply to federal habeas proceedings that originate in the Supreme Court). AEDPA prohibits this Court from doing it here.
AFFIRMED.

. Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (recognizing national consensus against execution of mentally retarded persons, and concluding such executions violated Eighth Amendment’s ban on cruel and unusual punishments).

. The Eighth Amendment issue is the sole question the parties were directed to brief, and we precisely quote the issue from the briefing instructions.

. Atkins is not based on the Fourteenth Amendment’s Due Process Clause and a defendant’s procedural right to a fair criminal trial, but only on the Eighth Amendment's cruel and unusual punishment prohibition. The narrow question before the en banc court thus concerns only the Eighth Amendment and AEDPA's highly deferential review of state court decisions.

. Shortly after the passage of O.C.G.A. § 17-7-131(c)(3) and (j), the Georgia Supreme Court upheld a state constitutional challenge to the death penalty as applied to mentally retarded defendants who were tried before the effective date of the statute. Fleming v. Zant, 259 Ga. 687, 386 S.E.2d 339 (1989), superseded in part by statute, Turpin v. Hill, 269 Ga. 302, 498 S.E.2d 52, 53-54 (1998). Thus, thirteen years before Atkins in 2002, the Georgia Supreme Court concluded that executing a mentally retarded defendant constitutes cruel and unusual punishment as defined in the Georgia Constitution. Id. at 342, 122 S.Ct. 2242.

. The Georgia Supreme Court noted that (1) Hill was tried three years after the 1988 effective date of § 17-7-131(c)(3) and (j), and (2) Hill never alleged (either at trial in 1991 or on direct appeal in 1993) that he was mentally retarded. Hill II, 498 S.E.2d at 52. Therefore, Hill's claim was procedurally defaulted. Id. Nevertheless, the Georgia Supreme Court concluded that, to the extent that Hill’s mental retardation claim challenged the imposition of the death penalty, it fell within Georgia's "miscarriage of justice” exception to its procedural default rules. Id. at 53. Thus, Georgia has allowed death-sentenced inmates to raise the mental retardation bar in collateral proceedings even if procedurally defaulted.

. In Stripling v. State, 261 Ga. 1, 401 S.E.2d 500 (1991), the Georgia Supreme Court stated that the “significantly subaverage general intellectual functioning” prong of the mental retardation definition "is generally defined as an IQ of 70 or below,” but that “an IQ test score of 70 or below is not conclusive” because “an IQ score is only accurate within a range of several points, and for a variety of reasons, a particular score may be less accurate.” Id. at 504. Similarly, in Atkins, the Supreme Court noted that an IQ score between 70 and 75 “is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." Atkins, 536 U.S. at 309 n. 5, 122 S.Ct. at 2245 n. 5. The Atkins Court also stated, " '[m]ild’ mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70.” Id. at 308 n. 3, 122 S.Ct. at 2245 n. 3.

. Before trial in 1991, clinical psychologist Dickinson evaluated Hill using the Wechsler Adult Intelligence Scale, Revised ("WAIS-R”) test. Hill's full-scale IQ score on the WAIS-R was 77. Dickinson also administered to Hill in 1991 the Peabody Picture Vocabulary Test ("PPVT”), on which Hill earned an estimated IQ score of 74. Records show Hill took the PPVT when he was in second grade and scored a 75.
In 1997, in Hill's state habeas proceedings, Dr. Daniel Grant evaluated Hill using the Stanford-Binet Intelligence Test, and Hill received an IQ score of 72. In 2000, Dr. Jethro Toomer administered the Wechsler Adult Intelligence Scale III ("WAIS-III”) to Hill. Hill’s full-scale IQ score on the WAIS-III was 69.
Hill produced an affidavit from Dickinson in 2000 stating that his earlier finding of no mental retardation was erroneous because it was based on inadequate information, and his original IQ testing of Hill led to an inaccurate and misleading result. See Hill II, 498 S.E.2d at 52 n. 1. In this affidavit, Dickinson opined that the 1991 WAIS-R overestimated Hill’s IQ by 3-7 points; given Dickinson's original score of 77, this still results in a range of 70-74.

. Hill does not complain about having the state habeas judge, as opposed to a jury, decide his mental retardation claim, given that he had a statutory right to raise the issue in his initial jury trial but he did not raise it until five years later, in state habeas proceedings.

. We review de novo the legal conclusions reached by the district court in denying Hill's § 2254 petition. Owen, 568 F.3d at 907. We review the district court's factual findings for clear error, and mixed questions of law and fact de novo. Id.

. The Supreme Court in Duren set forth the following showing required for a prima facie claim that a petit jury was not drawn from a fair cross-section of the community:
In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive” group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.
Duren, 439 U.S. at 364, 99 S.Ct. at 668.

. One dissent criticizes our reference to these recent Supreme Court decisions and argues these cases are not in point because they involve "dual layers of deference,” Lett, 130 S.Ct. at 1865, that is, (1) the deference required by AEDPA, and (2) an additional underlying deferential standard of proof for the relevant claim (such as ineffective assistance of counsel). Infra, at 68 n. 2 (Dissenting opinion of Barkett, J.). Contrary to that dissent’s contentions, the parts we quote from these cases are only about the AEDPA deference, not the second layer for the underlying claim. Moreover, four of these Supreme Court decisions did not involve ineffective assistance of counsel as the underlying claim.
In this case we are obviously not taking a deferential view of, say, trial counsel’s performance in addition to deferring, as AEDPA requires, to any reasonable decision of the Georgia Supreme Court. That fact, however, does not change the AEDPA deference standard, which does apply here. Regardless of the standard of proof for the underlying claim, the Supreme Court has repeatedly instructed, as shown above, that our AEDPA review is highly deferential and we may not grant habeas relief unless the state court decision is contrary to or an unreasonable application of a prior Supreme Court holding.

. Moreover, as part of its national consensus analysis, the Atkins Court cited the Georgia statute at issue here — O.C.G.A. § 17-7-131, which then, as now, required mental retardation to be proven beyond a reasonable doubt. Atkins, 536 U.S. at 313-14 & n. 9, 122 S.Ct. at 2248 & n. 9. Notably, there was no criticism of the Georgia statute.

. The state supreme courts are split on the burden of proof issue in mental retardation cases. Compare State v. Grell, 212 Ariz. 516, 135 P.3d 696, 705 (2006) (finding clear and convincing evidence standard for mental retardation claims is constitutional), People v. Vasguez, 84 P.3d 1019, 1023 (Colo.2004) (stating that "the substantive restriction oí Atkins” does not limit Colorado's "discretion in allocating and quantifying the appropriate burden of proof”), and Hill III, 587 S.E.2d at 621-22, with Pruitt v. State, 834 N.E.2d 90, 103 (Ind.2005) (invalidating clear and convincing evidence scheme for mental retardation claims based not on clearly established Supreme Court holdings but on the "implication” of Atkins) and State v. Williams, 831 So.2d 835, 860 (La.2002) (stating decision to invalidate clear and convincing evidence requirement was one made in "the absence of any guidance from the Supreme Court”), superseded in part by statute, La.Code Crim. Proc. Ann. art. 905.5.1 (2003), as recognized in State v. Turner, 936 So.2d 89 (La.2006). Unlike federal courts, state supreme courts are not constrained by AEDPA.

. In three of Georgia’s post-Atkins death penalty cases, Schofield v. Holsey, 281 Ga. 809, 642 S.E.2d 56(Ga.) (appeal from denial of state habeas petition), cert. denied, 552 U.S. 1070, 128 S.Ct. 728, 169 L.Ed.2d 569 (2007); Head v. Stripling, 277 Ga. 403, 590 S.E.2d 122 (2003) (appeal from denial of state habeas petition), cert. denied, 541 U.S. 1070, 124 S.Ct. 2400, 158 L.Ed.2d 976 (2004); King v. State, 273 Ga. 258, 539 S.E.2d 783 (2000) (direct appeal), cert. denied, 536 U.S. 982, 123 S.Ct. 17, 153 L.Ed.2d 880 (2002), the United States Supreme Court denied capital defendants’ certiorari petitions that made the same constitutional reasonable doubt challenge that Hill makes here. As King v. State illustrates, another avenue (certiorari petition on direct appeal) exists to present the constitutional issue here in a way that is not constrained by AEDPA deference and the requirement of clearly established federal law as shown by a United States Supreme Court holding.

. The Supreme Court in Leland also stated, "We are ... reluctant to interfere with Oregon's determination of its policy with respect to the burden of proof on the issue of sanity since we cannot say that policy violates generally accepted concepts of basic standards of justice." Id. at 799, 72 S.Ct. at 1007-08.

. The plurality opinion in Ford discussed the procedures by which a state will determine insanity-based exclusion from execution under the Eighth Amendment:
[W]e must conclude that the State's procedures for determining sanity are inadequate to preclude federal redetermination of the constitutional issue. We do not here suggest that only a full trial on the issue of sanity will suffice to protect the federal interests; we leave to the State the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences. It may be that some high threshold showing on behalf of the prisoner will be found a necessary means to control the number of nonmeritorious or repetitive claims of insanity. Other legitimate pragmatic considerations may also supply the boundaries of the procedural safeguards that feasibly can be provided.
Id. at 416-17, 106 S.Ct. at 2605 (footnote and citation omitted). The plurality opinion noted that Florida’s procedure was deficient for not furnishing the procedural safeguards of: an opportunity for the prisoner to submit evidence, an opportunity for the prisoner to impeach or challenge the opinions of the state-appointed mental health experts, and placement of factfinding authority in the hands of a neutral party. Id. at 413-16, 106 S.Ct. at 2603-05.

. Two district court judges in our circuit have examined the Georgia statute in other cases and, like us, have similarly failed to see a "clearly established” right to a more lenient burden of proof in tire mental retardation context. See Ledford v. Head, No. 1:02-CV-1515-JEC, 2008 WL 754486, at *3 n. 6 (N.D.Ga. Mar. 19, 2008) (Carnes, J.) ("There is no language in Atkins to suggest that Georgia’s standard is constitutionally impermissible. In fact, the Supreme Court cited Georgia's statute with approval.”); Ferrell v. Head, 398 F.Supp.2d 1273, 1295 (N.D.Ga.2005) (Thrash, J.) ("Atkins makes it abundantly clear that each state is permitted to design its own system for determining mental retardation, insofar as such system does not wholly erode the constitutional prohibition against execution of the mentally retarded. The Petitioner fails to persuade this Court that Georgia's statute so erodes this prohibition.”), rev’d in part on other grounds by Ferrell v. Hall, 640 F.3d 1199 (11th Cir.2011).

. See, e.g., Ariz.Rev.Stat. Ann. § 13-753 (establishing procedure by which defendants in capital cases are pre-screened by psychological expert who administers IQ test; those with scores below 76 are tested further by mental retardation experts, and if the defendant then scores 70 or below on any IQ test, the court conducts a hearing at which the defendant must prove mental retardation by clear and convincing evidence; a "determination by the trial court that the defendant’s intelligence quotient is sixty-five or lower establishes a rebuttable presumption that the defendant has mental retardation,” but "a defendant with an intelligence quotient of seventy or below” can still prove mental retardation by the clear and convincing evidence standard), amended by 2011 Ariz. Legis. Serv. 89 (West) (replacing term "mental retardation” with "an intellectual disability”); Ark. Code Ann. § 5-4-618(a)(2) ("There is a rebut-table presumption of mental retardation when a defendant has an intelligence quotient of sixty-five (65) or below.”); 725 Ill. Comp. Stat. § 5/114 — 15(d) (2010) ("An intelligence quotient (IQ) of 75 or below is presumptive evidence of mental retardation.”), amended by 2011 Ill. Legis. Serv. 97-227 (replacing terms "mentally retarded” and “mental retardation” with "intellectually disabled” and "an intellectual disability”); Ky.Rev.Stat. Ann. § 532.130 (" 'Significantly subaverage general intellectual functioning' is defined as an intelligence quotient (I.Q.) of seventy (70) or below.”); Neb.Rev.Stat. § 28-105.01(3) ("An *1352 intelligence quotient of seventy or below on a reliably administered intelligence quotient test shall be presumptive evidence of mental retardation.”); S.D. Codified Laws § 23A-27A-26.2 ("An intelligence quotient exceeding seventy on a reliable standardized measure of intelligence is presumptive evidence that the defendant does not have significant subaverage general intellectual functioning.”); Wiley v. Epps, 668 F.Supp.2d 848, 897 (N.D.Miss. 2009) ("In Mississippi, [an] IQ of 75 is the ‘cutoff score’ for assessing subaverage intellectual functioning for purposes of diagnosing mental retardation.”).

. We do not hold, as one dissent charges, "that states have complete discretion to choose any procedures to govern the determination of mental retardation.” Infra, at 72 (Dissenting opinion of Barkett, J.). We decide only the issue before us, which concerns only the standard of proof, and we hold only that the Georgia Supreme Court’s decision in Hill III was not contrary to, and did not involve an unreasonable application of, Afkins.

. Florida law directed the Governor to appoint a commission of three psychiatrists to simultaneously examine the defendant and then to provide an ex parte report to the Governor. The Supreme Court found that Florida’s process suffered from a number of grievous flaws: (1) defendants were not included at all in the "truth-seeking process”; (2) defendants were prohibited from submitting material to the factfinder; (3) there was no opportunity for the defendant to challenge or impeach state-appointed experts; (4) the psychiatric examination of defendant Ford was only 30 minutes long; and (5) the insanity evaluation process was housed exclusively within the province of the executive branch, which gave the Governor the final say over fact findings needed to trigger the constitutional protection. See Ford, 477 U.S. at 416, 106 S.Ct. at 2605 ("In no other circumstance *1353 of which we are aware is the vindication of a constitutional right entrusted to the unreviewable discretion of an administrative tribunal.’’) (plurality opinion).

. If anything, Georgia’s procedural protections go above and beyond the protections required by Ford. For starters, the plurality opinion in Ford made clear that it did not "suggest that only a full trial on the issue of sanity will suffice to protect the federal interests.” Id. Here, Georgia provides for a full trial on the issue of mental retardation. Furthermore, Justice Powell’s decision to join the four-vote plurality in Ford was based not on plucking out one piece of Florida's procedure, but rather on his assessment that, considered collectively, "the procedures followed by Florida in this case do not comport with basic fairness." Id. at 399, 106 S.Ct. at 2609 (emphasis added).

. Hill asks this Court to review the burden of proof standard in isolation. However, we should not ignore the full range of rights available to a capital defendant claiming mental retardation under O.C.G.A. § 17-7-131 merely because Hill — by raising his mental retardation claim not as part of his criminal trial as the statute contemplates, but only later in his state habeas case — did not take advantage of all the rights available to him.

. Although Bailey did not expressly rely on due process grounds in finding a constitutional violation, its focus on state procedural rules and its subsequent use by the Supreme Court suggest a due process analysis. See Speiser, 357 U.S. at 526, 78 S.Ct. at 1342 (relying on Bailey as part of its analysis finding a due-process-based First Amendment infringement); see also Heiner v. Dorman, 285 U.S. 312, 329, 52 S.Ct. 358, 362, 76 L.Ed. 772 (1932) (quoting Bailey s pronouncement “that a constitutional prohibition cannot be transgressed indirectly by the creation of a statutory presumption’’ in context of due process discussion). But even if Bailey is read as relying not on due process but only the Thirteenth Amendment, it undisputedly is not an Eighth Amendment case.

. When the Supreme Court in Panetti noted (1) that the state court's decision rested on the implicit finding that the procedures provided were adequate, (2) that "this determination cannot be reconciled with any reasonable application of the controlling standard in Ford,” and (3) "[t]hat the standard is stated in general terms does not mean the application was reasonable,” 551 U.S. at 952-53, 127 S.Ct. at 2858, the “standard” to which the Court was referring was Ford's procedural due process standard, not its substantive Eighth Amendment standard.