FILED
United States Court of Appeals
Tenth Circuit

January 18, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

GEORGE OCHOA,

   Petitioner - Appellant,

  v.

RANDALL G. WORKMAN, Warden,
Oklahoma State Penitentiary,

   Respondent - Appellee.

No. 10-6088

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. 5:06-CV-01348-R)**

James L. Hankins, Ogle Law Office, P.L.L.C., Oklahoma City, Oklahoma, for
Petitioner-Appellant.

Jennifer B. Miller, Assistant Attorney General (W.A. Drew Edmondson, Attorney
General of Oklahoma, with her on the brief), Oklahoma City, Oklahoma, for
Respondent-Appellee.

Before **MURPHY**, **HARTZ**, and **HOLMES**, Circuit Judges.

**MURPHY**, Circuit Judge.

# I. INTRODUCTION

In *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), the Supreme Court held that the Eighth Amendment precludes the execution of mentally retarded criminals. Relying on *Atkins*, the Oklahoma Court of Criminal Appeals ("OCCA") granted George Ochoa, a convicted murderer under sentence of death, a post-conviction jury trial to determine whether he was mentally retarded. The jury found Ochoa failed to meet his burden of proving, by a preponderance of the evidence, he was mentally retarded. The OCCA affirmed. *Ochoa v. State*, 136 P.3d 661, 670 (Okla. Crim. App. 2006). This court granted Ochoa permission to file a second 28 U.S.C. § 2254 petition raising his *Atkins* claims in federal district court. *Ochoa v. Sirmons*, 485 F.3d 538, 546 (10th Cir. 2007). After the district court denied Ochoa's second § 2254 habeas petition on the merits, Ochoa filed the instant appeal.

Ochoa's appeal implicates the intersection of *Atkins* and the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"). Ochoa contends Oklahoma law, which focuses on whether a defendant *is* mentally retarded at the time of trial, instead of whether he *was* mentally retarded at the time of the commission of the crime, is "contrary to, or . . . an unreasonable application of" *Atkins*. 28 U.S.C. § 2254(d)(1). We reject this contention. Oklahoma's determination that mental retardation is not a fluid concept is entirely consistent with *Atkins*. Ochoa further asserts his trial was

fundamentally unfair because (1) the jury was informed he had been convicted of a crime, (2) he was forced to attend trial in an orange prison jumpsuit, and (3) he was forced to wear a shock sleeve during trial. Despite Oklahoma's arguments to the contrary, this court concludes these claims are *Atkins* claims. Thus, the district court properly resolved them on the merits. 28 U.S.C. § 2244(b). We further hold the district court correctly concluded none of the alleged errors identified by Ochoa entitle him to habeas relief. Thus, exercising jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(c)(1)(A), this court **affirms** the order of the district court denying Ochoa's § 2254 habeas petition.[1]

---

[1]Pending before this court is Ochoa's request for an expanded certificate of appealability ("COA"). To obtain the benefit of *Atkins*, an Oklahoma defendant facing the death penalty must prove, by a preponderance of the evidence, he is mentally retarded. *Ochoa v. State*, 136 P.3d 661, 665 (Okla. Crim. App. 2006). In his habeas petition, Ochoa asserted this aspect of Oklahoma law is contrary to *Atkins*. The district court disagreed. Ochoa seeks an expanded COA so he can appeal the district court's denial of habeas relief as to this issue.

To be entitled to a COA, Ochoa must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). That is, he must demonstrate "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quotations omitted). Ochoa cannot satisfy this standard. The Supreme Court specifically left to the various states "the task of developing appropriate ways to enforce the constitutional restriction" on the execution of mentally retarded criminals. *Atkins v. Virginia*, 536 U.S. 304, 317 (2002) (quotation omitted). In an analogous context, the Court specifically approved placing the burden on a defendant of demonstrating, by a preponderance of the evidence, his incompetence to stand trial. *Medina v. California*, 505 U.S. at 437, 450-52 (1992). Furthermore, of those jurisdictions that impose the death penalty, none impose on the government the burden of disproving mental retardation. *Hill*

(continued...)

-3-

## II. BACKGROUND

An Oklahoma state jury found Ochoa guilty of, *inter alia,* two counts of first degree murder and sentenced him to death. On direct appeal, the OCCA affirmed. *Ochoa v. State*, 963 P.2d 583, 606 (Okla. Crim. App. 1998). After exhausting his state post-conviction remedies, Ochoa filed a 28 U.S.C. § 2254 petition in federal district court. The district court denied habeas relief in an extensive order. Ochoa appealed the district court's denial of habeas relief to this court (No. 02-6032).

After briefing was complete and No. 02-6032 was set for oral argument, this court stayed the appeal, upon Ochoa's motion, so he could exhaust an *Atkins* claim in state court. Oklahoma held a jury trial on Ochoa's *Atkins* claim; the jury concluded Ochoa did not prove he was mentally retarded. The OCCA affirmed.

---

[1](...continued)
*v. Humphrey*, No. 08-15444, 2011 WL 5841715, at *18 (11th Cir. Nov. 22, 2011) (en banc). Instead, the overwhelming majority place the burden in a way identical to Oklahoma law. *Id.* The district court's conclusion that Oklahoma law is neither contrary to, nor an unreasonable application of *Atkins* is simply not debatable. *See Williams v. Taylor*, 529 U.S. 362, 405-413 (2000) (defining § 2254(d)(1)'s "contrary to" and "unreasonable application of" prongs and holding it is a difficult task to meet either standard). This is especially true because to prevail on this claim in Oklahoma, a defendant need only convince one juror the defendant is mentally retarded. *Lambert v. State*, 71 P.3d 30, 32 (Okla. Crim. App. 2003) ("If there is no unanimous verdict either finding or rejecting mental retardation, the trial court will resentence [Defendant] to life imprisonment without parole. This is in keeping with the low burden of proof; on a question of this constitutional magnitude, if jurors cannot agree on whether it is more likely than not that [Defendant] is retarded, [Defendant] will receive the benefit of that doubt.").

*Ochoa v. State*, 136 P.3d 661, 670 (Okla. Crim. App. 2006). This court then granted Ochoa permission to file a second § 2254 petition raising his *Atkins* claim in federal district court. *Ochoa v. Sirmons*, 485 F.3d 538, 539 (10th Cir. 2007). After the district court denied habeas relief, Ochoa brought the instant appeal to this court (No. 10-6088).[2]

## III. STANDARD OF REVIEW

Ochoa is entitled to federal habeas relief only if the OCCA's resolution of his claims "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). This court presumes a state court's factual findings are correct unless the petitioner rebuts that presumption by "clear and convincing evidence." *Id.* § 2254(e)(1).

We first determine whether the principle of federal law upon which Ochoa relies was "clearly established by the Supreme Court at the time of the state court judgment." *Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006). Clearly established law consists of Supreme Court holdings in cases "where the facts are at least closely related or similar" to the facts in Ochoa's case. *House v. Hatch*,

---

[2]On December 1, 2011, this court affirmed the district court's denial of Ochoa's § 2254 habeas petition in No. 02-6032. *Ochoa v. Workman*, No. 02-6032, 2011 WL 6000510, at *17 (10th Cir. Dec. 1, 2011) (unpublished disposition).

527 F.3d 1010, 1016 (10th Cir. 2008). "The absence of clearly established federal law is dispositive under § 2254(d)(1)." *Id.* at 1018. If clearly established federal law exists, this court moves on to consider whether the OCCA decision was contrary to or an unreasonable application of that clearly established federal law.

> A decision is "contrary to" clearly established federal law . . . if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases or if the state court confronts a set of facts . . . materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from the result reached by the Supreme Court.

*Bland*, 459 F.3d at 1009 (quotations omitted). "A state court decision involves an 'unreasonable application' of federal law if the state court identifies the correct governing legal principle from Supreme Court decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* (quotation omitted).

## IV. ANALYSIS

### A. Temporal Focus of Mental Retardation Determination

#### 1. Background

At his mental retardation trial, Ochoa asked for a jury instruction focused on whether he was retarded at the time he committed the crimes. The trial court denied the request and instructed the jury to determine whether Ochoa was mentally retarded at the time of the trial. On direct appeal,[3] Ochoa asserted the

---

[3]"Though this appeal remains part of Mr. Ochoa's post-conviction case, we
(continued...)

-6-

trial court's instruction was at odds with *Atkins*. The OCCA rejected Ochoa's

assertion of error, concluding:

> Ochoa argues that the Supreme Court's holding in *Atkins* prohibits the State from executing a person who was mentally retarded at the time the crimes were committed, not at the time of the jury trial on the issue of mental retardation. Evidence presented at Ochoa's jury trial on mental retardation showed that Ochoa scored higher on intelligence tests given in 2003 than on those given to him in 1995 and 1996. Evidence also was presented which showed Ochoa had learned to read and write while incarcerated and suggested his ability to learn to read and write likely contributed to his more current test performance.

> Counsel for Ochoa requested the trial court instruct the jury that it must find Ochoa was mentally retarded at the time of the offense and the trial court denied the requested instructions. Ochoa argues that the focus of the Court in *Atkins* was upon the moral culpability of the offender at the time of the crime and the relevant constitutional inquiry is not whether the offender is retarded at the moment, but rather whether the offender was retarded when the crime occurred. He asks this Court to vacate the jury's verdict because it was rendered upon instructions which required it to find Ochoa was presently mentally retarded.

> Although the Court in *Atkins* did not specifically define "mental retardation" for the individual States and left . . . to the States "the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences," there it referenced two generally accepted clinical definitions. *Atkins*, 536 U.S. at 317 n.22. Both definitions require mental retardation to be present before the age of eighteen (18). *Id.* at 308 n.3 (AAMR definition requires mental retardation to "manifest" before age eighteen; American Psychiatric Association's definition states the "onset must occur before" eighteen (18)).

---

[3](...continued)
will review errors alleged to have occurred in this jury trial on mental retardation in the same manner as errors raised on direct appeal from a trial on the merits." *Ochoa*, 136 P.3d at 664.

We disagree with Ochoa's description of mental retardation as a "fluid concept." While we do not dispute that a mentally retarded person can learn and develop skills, that ability is limited and the ability to learn and to adaptively function suggests the individual was likely not mentally retarded in the first place but fell into that borderline range or classification due to environmental or other factors which affected present ability. The witness at Ochoa's trial acknowledged this when she testified that some people functioning at a low level due to environment, education or impoverishment could move "above the level" of mental retardation classification by increasing his or her abilities to function. That Ochoa may have had an IQ score within the range of 70 to 75 at the time of the crime is relevant but does not prove mental retardation. "I.Q. tests alone are not determinative of the issue of mental retardation." *Myers*, 130 P.3d at 268.

The requisite cognitive and behavioral impairments attendant to mental retardation, as defined by this Court in evaluating Eighth Amendment claims, substantially limits one's ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others. We do not dispute that a mentally retarded person can learn. However, a person who can learn beyond the accepted clinical definitions of mental retardation does not fall within the definition of those persons who may avoid execution due to mental retardation. The evidence presented at Ochoa's mental retardation jury trial showed he does not function at a significantly sub-average intellectual level that substantially limits his ability to understand and process information, to communicate, to learn from his mistakes, to engage in logical reasoning, to control impulses, and to understand the reaction of others. The jury was properly instructed it must find Ochoa "is" mentally retarded, as opposed to finding he "was" mentally retarded at the time of the crime.

*Ochoa*, 136 P.3d at 665-66.

## 2. Discussion

Ochoa contends the OCCA's decision to adopt a definition of mental retardation in which the disability is static is "contrary to, or an unreasonable application of," *Atkins*. 28 U.S.C. § 2254(d)(1). According to Ochoa, the Supreme Court's focus in *Atkins* was upon the moral culpability of the offender at the time of his commission of the crime. In support of this contention, Ochoa cites the following language from *Atkins*: "Because of their disabilities in the areas of reasoning, judgment, and control of their impulses, . . . [the mentally retarded] *do not act* with the level of moral culpability that characterizes the most serious adult criminal conduct." 536 U.S. at 306 (emphasis added).[4] In essence,

[4]As noted by the district court, Ochoa's arguments in this regard ignore those portions of *Atkins* with a temporal focus other than the time of the commission of the crime. In particular, in concluding the Eighth Amendment prohibited the execution of the mentally retarded, the Court relied heavily on the general inability of the mentally retarded to meaningfully participate in their defense:

> The reduced capacity of mentally retarded offenders provides a second justification for a categorical rule making such offenders ineligible for the death penalty. The risk "that the death penalty will be imposed in spite of factors which may call for a less severe penalty," *Lockett v. Ohio*, 438 U.S. 586, 605 (1978), is enhanced, not only by the possibility of false confessions, but also by the lesser ability of mentally retarded defendants to make a persuasive showing of mitigation in the face of prosecutorial evidence of one or more aggravating factors. Mentally retarded defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes. . . . [M]oreover, reliance on mental retardation as a mitigating factor can be a two-edged sword

(continued...)

-9-

Ochoa asserts *Atkins* requires that Oklahoma adopt a fluid definition of mental retardation, i.e., a definition specifically contemplating the possibility an individual may outgrow his mental retardation.[5] Because the jury at his mental retardation trial was instructed to determine whether Ochoa was mentally retarded at the time of the trial, rather than at the time of the murders, Ochoa asserts Oklahoma's resolution of his mental retardation claim was contrary to, or an unreasonable application of, *Atkins*.

*Atkins* concluded "a national consensus has developed against" the execution of the mentally retarded. 536 U.S. at 316. In so concluding, however, the Court explicitly recognized that no such consensus existed as to the exact parameters of the term "mentally retarded":

> To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. . . . Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in *Ford v. Wainwright*, 477 U.S. 399 (1986), with regard to insanity, "we leave to the State[s] the task of developing

[4](...continued)
that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury. Mentally retarded defendants in the aggregate face a special risk of wrongful execution.

*Atkins*, 536 U.S. at 320-21 (citation and footnote omitted).

[5]Ochoa advocates a fluid definition of mental retardation because his available IQ scores closer to the time of the murders were lower than scores on tests taken closer to the time of his mental retardation trial. *See Ochoa*, 136 P.3d at 665.

-10-

> appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." Id. at 405, 416–417.

Id. at 317. Furthermore, the Court recently reiterated that *Atkins* specifically avoided establishing "substantive guides for determining when a person who claims mental retardation will be so impaired as to fall [within *Atkins*' compass]," instead leaving that task to the states in the first instance. *Bobby v. Bies*, 129 S. Ct. 2145, 2150 (2009) (alteration in original) (quotation omitted); *see also Hill v. Humphrey*, No. 08-15444, 2011 WL 5841715, at *15 (11th Cir. Nov. 22, 2011) (en banc) ("*Atkins* did not bestow a substantive Eighth Amendment right to a fixed and rigid definition of 'mentally retarded persons.' Indeed, various states use different definitions of intellectual functioning (some draw the line at an IQ of 75 or below, some at 70 or below, others at 65 or below) and consider different factors in assessing adaptive functioning." (footnote omitted)). This court can say with certainty that *Atkins* did not address "the time frame, if any, at which a finding of mental retardation is relevant, *i.e.*, time of offense, time of trial, or time of execution." *Bowling v. Commonwealth*, 163 S.W.3d 361, 369 (Ky. 2005). This absolute absence of clearly established Supreme Court precedent dooms Ochoa's claim. *House*, 527 F.3d at 1018 ("The absence of clearly established federal law is dispositive under § 2254(d)(1)."). Thus, the OCCA's determination that mental retardation is a static condition—and that those who at the time of the mental retardation trial are not mentally retarded, never were mentally

retarded—is neither contrary to, nor an unreasonable application of, *Atkins'*

prohibition on the execution of the mentally retarded.  *See Wright v. Van Patten*,

552 U.S. 120, 125 (2008) (concluding that because no decision of the Court

"squarely addresse[d]" the issue presented and because none of the Court's cases

gave a "clear answer to the question presented," the federal habeas court could

not find the state court unreasonably applied clearly established law).

Furthermore, Ochoa does not cite a single authority for the proposition that

mental retardation is a fluid concept.[6]  The Supreme Court, on the other hand,

---

[6]That is not to say, however, that there is no such authority.  The Fourth
Edition of the Diagnostic and Statistical Manual of Mental Disorders ( "DSM-
IV"), the diagnostic tool referenced by Ochoa's expert during her testimony,
provides as follows:

> Mental retardation is not necessarily a lifelong disorder.  Individuals
> who had Mild Mental Retardation earlier in their lives manifested by
> failure in academic learning tasks may, with appropriate training and
> opportunities, develop good adaptive skills in other domains and may
> no longer have the level of impairment required for a diagnosis of
> Mental Retardation.

American Psychiatric Association, Diagnostic and Statistical Manual of Mental
Disorders 44 (4th ed. 1994).  The DSM-IV defines "Mild Mental Retardation" as
an "IQ level 50-55 to approximately 70." *Id.* at 40.  Finally, the DSM-IV makes
clear that the ability to outgrow mental retardation is tied to potential
improvement in adaptive functioning, rather than IQ changes. *Id.* ("Problems in
adaption are more likely to improve with remedial efforts than is the cognitive IQ,
which tends to remain a more stable attribute.").

Ochoa's theory at trial is inconsistent with the diagnostic criteria set out in
DSM-IV.  Ochoa's own expert testified he was not likely mentally retarded at the
time of the trial.  In an effort to overcome this undisputed fact, trial counsel asked
the expert to opine on the question whether Ochoa was likely mentally retarded at
(continued...)

-12-

citing to scholarship in the field, has noted "[m]ental retardation is a permanent, relatively static condition." *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 323 (1993). For this reason, the Kentucky Supreme Court concluded the question of temporal focus "is more semantical than real." *Bowling*, 163 S.W.3d at 377 (citing *Heller* and the scholarship cited therein for the proposition that because mental retardation is a "permanent, relatively static condition," it would be "exceedingly rare" for the condition to "recede during the interim between the offense and the execution"); *see also State v. Arellano*, 143 P.3d 1015, 1020 (Ariz. 2006) (holding that because mental retardation is a static condition, "evidence of any skills or deficiencies in adaptive behavior exhibited by a defendant, even after age eighteen, helps determine whether a defendant has mental retardation").

Ochoa has failed to carry his burden of demonstrating the definition of mental retardation adopted by the OCCA is "contrary to . . . or an unreasonable application of" *Atkins*. 28 U.S.C. § 2254(d)(1).

---

[6](...continued)
the time of the crime. In particular, trial counsel focused the expert's attention on those IQ scores obtained in close temporal proximity to the crime, because those few scores were considerably lower than a more recent test. Then, during closing argument, trial counsel argued mental retardation is a fluid concept and that IQ scores can improve over time. On this basis, trial counsel asked the jury to conclude Ochoa was mentally retarded at the time of his commission of the crime. As set out above, however, this theory of mental retardation is not consistent with the DSM-IV and Ochoa has not offered any citations to any authority supporting such a medical definition of mental retardation. That being the case, Ochoa cannot offer a persuasive argument that his proffered definition of mental retardation is the only definition consistent with *Atkins*.

**B. Fundamental Fairness of Ochoa's Mental Retardation Trial**

**1. Background**

On direct appeal from the jury's determination he had not proven he was mentally retarded, Ochoa asserted three procedural irregularities rendered his trial unfair: (1) the jury learned of Ochoa's prior conviction; (2) Ochoa went to trial wearing his orange prison jumpsuit; and (3) Ochoa was forced to wear a shock sleeve during the trial. The OCCA determined Ochoa was not entitled to relief:

> Ochoa contends the trial was fundamentally unfair because the jury learned of [his] prior convictions and . . . saw [him] wearing orange jail overalls and a "shock sleeve." The record reflects Ochoa chose not to dress out; and, following counsel's request that the trial court admonish him not to act inappropriately during the trial, Ochoa responded to the trial court's admonishments with obvious upset. After the trial court advised Ochoa he would be removed from the court room if he were to be disruptive, Ochoa responded that he was "being railroaded anyway, so it didn't matter to" him. At this point the trial court asked the deputy to put on "the sleeve," noting that "it may ensure that he won't behave inappropriately." After the deputy left with Ochoa, the trial court stated, "I've observed them with that on. They don't seem to be a problem." When Ochoa returned to the court room, counsel said Ochoa wanted to make a record on "the sleeve." The trial court asked, "he objects to it?" Upon counsel's affirmative response, the trial court stated, "he was going to cause a problem, now he's not."
>
> The potential jurors were called and the trial court informed the venire the case had "to do with a criminal matter that you will not hear about." The trial court explained a deputy was present because Ochoa was
>
> > in custody. So he's not free to leave . . . . So he's accompanied by a deputy all the time because he's in custody.

And he has been convicted of a crime that we're not going to tell you about at this point in time, okay? . . . [A]nd there's very limited reasons why you might hear it during the trial, but probably not. But he's been convicted of a crime.

After a potential juror indicated his best friend graduated from the police academy, the trial court stated, "I don't see any law enforcement officers, but this is a criminal case, okay. Criminal cases are involved in this." After a potential juror described being robbed at gunpoint and said this was not that kind of case, the trial court stated, "And that's true, but it does have criminal overtones to it." After *voir dire*, before court recessed for the day, the trial court noted the breaks were a little bit longer, because "Ochoa's in custody and you're eight floors away from the coffee shop . . . ." During *voir dire*, the prosecutor also stated "You understand he's already been convicted of a crime," and reminded the jurors they were not going to find out what Ochoa was convicted of and might have "unanswered questions."

Ochoa contends the jury should not have received any information relating to his custodial status and he should not have been "forced" to proceed at trial in prisoner clothing and the shock sleeve. Ochoa relies upon *Deck v. Missouri*, 544 U.S. 622 (2005), and argues he was deprived of due process and a fundamentally fair trial when the jury observed him in obvious restraint without being told why he was in custody.

The jury's knowledge that Ochoa was in custody, that he had previously been convicted, and that the proceeding was related to a criminal matter was not violative of *Lambert v. State*, 71 P.3d 30 (Okla Crim. App. 2003). While evidence relating to his criminal conviction and sentence of death are not relevant to the proceeding, the jury's knowledge that the proceeding was related to a criminal matter and that Ochoa was in custody and had been convicted of a crime does not create the prejudicial effect *Lambert* sought to avoid. . . .

It is error to compel an accused to appear before a jury in prison clothing where a timely request has been made for civilian clothing. However here, the record shows Ochoa's decision to

appear before the jury in jail dress was his own. He was compelled by no one but himself. We find no Fourteenth Amendment violation where Ochoa himself made the decision to appear in jail dress and no request for civilian clothing appears in the record. *Estelle v. Williams*, 425 U.S. 501, 512-513 (1976).

Ochoa's presence before the jury in the shock sleeve is a more difficult matter. . . . The Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to a jury absent a trial court determination, in the exercise of its discretion, that the restraints are justified by a state interest specific to a particular trial. *Deck*, 544 U.S. at 629. The Supreme Court extended this legal principle beyond guilt/innocence proceedings and reversed a death sentence reached by a jury in a trial where a defendant was shackled with leg irons, handcuffs, and a belly chain during the penalty stage of trial. *Id.* at 2014. . . .

. . . .

While the use of shackles or other restraints is clearly not favored, the constitutional requirement against routine restraints is not absolute. *Id.* A judge, in the exercise of discretion and taking into account the special circumstances of each proceeding, including security concerns, may call for shackling. *Id.* at 633. "But given their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case." *Id.* at 632.

. . . .

We agree . . . it is the trial judge's responsibility to control the decorum of the courtroom. However, this record does not sufficiently establish that Ochoa was in fact disruptive, violent or aggressive or that this level of control was needed. The trial court admitted its decision to put the shock sleeve on Ochoa was "like insurance" and was precautionary in nature. The trial court's statement that Ochoa told someone he was going to be disruptive was not sufficient to warrant the action taken by the trial court and its order requiring Ochoa to wear the shock sleeve constituted an abuse of discretion . . . .

-16-

The State argues the record does not show the shock sleeve was visible to the jury or that the jury knew what the shock sleeve was for, so even if the trial court should not have ordered Ochoa to wear it, no constitutional error resulted.  In *Phillips*, where the parties agreed the stun belt was not visible to the jury and the defendant was not physically restrained and his mental abilities were not hampered, this Court found the defendant was not deprived of a fair trial . . . .

Here the record does not show the shock sleeve was visible to the jury.  Even if it were visible, we doubt the jury's ability to see the shock sleeve was any more prejudicial to Ochoa than was the fact that the jury saw Ochoa wearing his jail clothing and Ochoa himself made the decision to dress out in jail clothing.  Ochoa does not claim the shock sleeve prevented him from physically or mentally assisting his counsel at the mental retardation hearing.  While this Court finds the trial court erred and abused its discretion by ordering Ochoa to wear the shock sleeve, Ochoa has not proven this error had a substantial influence on the outcome of the proceeding and has not shown prejudice.  *See e.g., U.S. v. McKissick*, 204 F.3d 1282, 1299 (10th Cir.2000) (court will not presume prejudice where there was no evidence jurors noticed the stun belt).

*Ochoa*, 136 P.3d at 667-70 (citations omitted).

## 2.  Discussion

### a.  28 U.S.C. § 2244(b)(4)

#### i.  Procedural Background

The filing of a second or successive § 2254 habeas petition, and the contents thereof, are tightly constrained by the provisions of the AEDPA.  As relevant to the instant case, the AEDPA provides

A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless . . . the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to

-17-

cases on collateral review by the Supreme Court, that was previously unavailable.

28 U.S.C. § 2244(b)(2)(A). A three-judge panel of this court concluded Ochoa made a prima facie showing that his application satisfied the requirements of § 2244(b)(2)(A) and, thus, authorized Ochoa to file "a second or successive habeas petition raising an *Atkins* challenge to his death sentence." *Ochoa*, 485 F.3d at 546.[7] Upon the filing of Ochoa's second or successive habeas petition in district court, Oklahoma sought dismissal of Ochoa's claims of procedural irregularity on the ground those particular claims did not satisfy the standard set out in § 2244(b)(2)(A). *See* 28 U.S.C. § 2244(b)(4) (providing that "[a] district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless" the claim satisfies the requirements of § 2244(b)(2)).[8] In particular, Oklahoma asserted the claims must be dismissed because these claims are based on non-*Atkins* Supreme Court

[7]*See also* 28 U.S.C. § 2244(b)(3)(A)-(B) (providing that no second or successive § 2254 petition can be filed in district court without authorization from a three-judge panel of the court of appeals); *id.* § 2244(b)(3)(C) (providing that this court may authorize the filing of a second or successive § 2254 petition only if a proposed application "makes a prima facie showing that the application satisfies the requirements" of § 2244(b)(2)).

[8]*See also LaFevers v. Gibson*, 238 F.3d 1263 (10th Cir. 2001) ("Upon the filing of [a] second §2254 petition [authorized by the circuit court], the district court was obligated to determine whether the petition did, in fact, satisfy the requirements of § 2244(b).").

decisions and decisions of the OCCA. The district court refused to dismiss

Ochoa's claims of procedural irregularity on this ground, concluding as follows:

> Petitioner's instant claim falls within a narrow category of cases. To review his second or successive petition as Respondent asserts, i.e., applying § 2244(b)(2)(A) to each individual ground for relief, would be unreasonable under the procedural aspects of this case and contrary to the intentions of the statute and the mandate of the Supreme Court in *Atkins*. Had Petitioner initially been tried after the decision in *Atkins*, he could have raised his claim of mental retardation prior to or during his criminal trial and each of his propositions attacking the constitutional validity of his sentence would be available for appellate and collateral review. Under the procedural circumstances involved here, the Court sees no justification that review of Petitioner's *Atkins* claim should not be any different.

> As the Tenth Circuit identified, and the State conceded, Petitioner's first habeas petition was denied in 2001. While on appeal from that denial, the Supreme Court decided *Atkins*, determining mentally retarded persons are ineligible for the death penalty and making its holding retroactively applicable to cases on collateral review. Petitioner returned to state court to pursue his *Atkins* claim in a post-conviction proceeding, where a trial was ordered by the OCCA on the issue of his mental retardation. . . . Pursuant to § 2244(b)(2)(A), this Court finds that Petitioner's *Atkins* claim satisfies the statute's requirements to proceed with a second or successive habeas petition, as *Atkins* was a new rule of constitutional law, previously unavailable to Petitioner, made retroactive by the Supreme Court to cases on collateral review. Accordingly, Respondent's Motion to Dismiss is denied.

On appeal, Oklahoma asserts the district court erred in refusing to dismiss,

pursuant to the terms of § 2244(b)(4), Ochoa's procedural irregularity claims.

The district court's determination that Ochoa's claims "satisfy the requirements of

§ 2244(b) is a legal conclusion which this court reviews *de novo*." *LaFevers v. Gibson*, 238 F.3d 1263, 1266 (10th Cir. 2001) (citation omitted).

### ii. Analysis

For those reasons set out below, the court concludes Ochoa's procedural irregularity claims are proper *Atkins* claims and, therefore, the district court properly denied Oklahoma's motion to dismiss.

We begin by noting the question whether Ochoa's procedural-irregularity claims fall within the ambit of § 2244(b)(2)(A) is one of first impression. This court has never addressed the contours of § 2244(b)(2)(A). Furthermore, it does not appear that any other circuit has addressed this question. This dearth of precedent is not surprising, given that "*Atkins* reflects one of the rare instances in which the Supreme Court has announced a new rule of constitutional law that it has also expressly made retroactively applicable to cases on collateral review." *Ochoa*, 485 F.3d at 540.[9] Those limited precedents that do exist, however, indicate Ochoa's procedural irregularity claims, although drawing their substance from the Fourteenth Amendment's Due Process Clause, are based on *Atkins*.

The Supreme Court has made clear that its decision in *Atkins* "did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation will be so impaired as to fall [within *Atkins*'

---

[9]Indeed, since the passage of the AEDPA in 1996, it appears *Atkins* represents the only such new rule.

-20-

compass]." *Bobby*, 129 S. Ct. at 2150 (quotation omitted) (alteration in original).[10]  Instead, it left "to the States the task of developing appropriate ways of enforcing the constitutional restriction" on the execution of the mentally retarded.  *Id.* (quotation omitted).  For that reason, the Court has indicated federal habeas courts should not preemptively dictate to the states matters of procedure or substance in the *Atkins* realm.  *Id.* at 2153-54 ("[Federal court] intervention . . . derailed a state trial court proceeding designed to determine whether Bies ha[s] a successful *Atkins* claim.  Recourse first to Ohio's courts is just what this Court envisioned in remitting to the States responsibility for implementing the *Atkins* decision.  [Ohio recognizes] Bies is entitled to such recourse, [and] rightly seeks a full and fair opportunity to contest his plea under the postsentencing precedents set in *Atkins* and [Ohio law]." (quotation and citation omitted)); *Schriro v. Smith*,

---

[10]As this quotation should make clear, the mere absence of procedural guidelines in *Atkins*, standing alone, does not justify a conclusion that Ochoa's procedural irregularity claims are not *Atkins* claims for purposes of § 2244(b)(2)(A).  As *Bobby* recognizes, *Atkins* is also bereft of substantive guidance as to the meaning of the term "mental retardation."  *Bobby v. Bies*, 129 S. Ct. 2145, 2150 (2009).  If the mere absence of guidance was sufficient to preclude review under § 2244(b)(2)(A), Ochoa's challenge to Oklahoma's definition of "mental retardation" would also be outside the ambit of § 2244(b)(2)(A).  Oklahoma does not, however, argue for such a result on appeal.  Furthermore, such a reading of § 2244(b)(2)(A) would render meaningless the Supreme Court's decision to make *Atkins* retroactive to cases on collateral review.

-21-

546 U.S. 6, 7-8 (2005) (concluding Ninth Circuit erred when it preemptively ordered Arizona to use jury trial procedures to resolve *Atkins* claims).[11]

The Supreme Court has also indicated, however, that state court "measures for adjudicating claims of mental retardation . . . might, in their application, be subject to constitutional challenge." *Schriro*, 546 U.S. at 7. That is the exact situation faced by this court. Oklahoma has adopted the full-blown jury trial, "with all its historic and procedural protections,"[12] as the appropriate mechanism for resolving claims of mental retardation. *Lambert v. State*, 71 P.3d 30, 31 (Okla. Crim. App. 2003). Ochoa has asserted certain aspects of that procedural mechanism, as applied to him, rendered his mental retardation trial fundamentally unfair. *Schriro* indicates such a challenge is properly brought in a § 2254 habeas petition. 546 U.S. at 7; *United States v. Serawop*, 505 F.3d 1112, 1122 (10th Cir. 2007) ("We are bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements." (quotations omitted)).

That each of the procedural irregularities identified by Ochoa implicate protections flowing from the Fourteenth Amendment's Due Process Clause does

[11]*See also Hill*, 2011 WL 5841715, at *15 (concluding Georgia procedural rule requiring defendants to prove mental retardation beyond a reasonable doubt is not contrary to or an unreasonable application of *Atkins* and asserting a contrary result would "ignore the clear language of *Atkins* . . . about who is to decide what procedures are to be used to determine mental retardation").

[12]*United States v. Essex*, 734 F.2d 832, 844 (D.C. Cir. 1984).

not change the result. "The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). The liberty interest at issue in this case, the right of the mentally retarded to avoid execution, flows directly from the Eighth Amendment. *Atkins*, 536 U.S. at 321 ("Construing and applying the Eighth Amendment in the light of our evolving standards of decency, we . . . conclude that [the death penalty] is excessive and that the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender." (quotation omitted)). Oklahoma adopted the jury trial, with its historically attendant procedural protections, as the method to vindicate that liberty interest. Ochoa's interest in ensuring Oklahoma applied that procedure in a fundamentally fair fashion flows directly from the liberty interest announced in *Atkins*. Accordingly, Ochoa's procedural irregularity claims are *Atkins* claims and, furthermore, those claims are properly brought in a second or successive habeas petition under the provisions of § 2244(b)(2)(A).

### b. Merits

#### i. Jail Attire at Trial

Ochoa asserts he was denied his right to a fundamentally fair proceeding when he was forced to attend his mental retardation trial in prison garb. *Estelle v. Williams*, 425 U.S. 501, 504-05 (1976). The very basic problem with this claim

of error, however, is the OCCA specifically found Ochoa chose to attend the trial in prison attire. *Ochoa*, 136 P.3d at 667 ("[T]he record shows Ochoa's decision to appear before the jury in jail dress was his own. He was compelled by no one but himself."). The OCCA's finding of fact is entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1). In any event, the record fully supports the OCCA's finding. Before jurors were present in the courtroom, Ochoa's counsel indicated she wanted to make a record about Ochoa's refusal to change out of his jail uniform. She then stated as follows: "We're on the record. Mr. Ochoa has chosen not to dress out and he's in orange. I don't believe he's cuffed, but I believe he's in his jail uniform and he chooses to do so." The trial court then allowed Ochoa to address the court; Ochoa complained about his counsel's failure to call certain witnesses, but did not address the prison-garb issue.

Ochoa does not contest this sequence of events. Instead, he asserts the trial court did not "flesh out" the issue of his refusal to dress out and that it is possible his conduct was an act of defiance against trial counsel. The problem for Ochoa, however, is that even assuming his suppositions are true, they do not bear on the question whether the decision of the OCCA was contrary to or an unreasonable interpretation of *Estelle*. 28 U.S.C. § 2254(d)(1). The Court in *Estelle* made absolutely clear that the absence of an objection in the trial record to being forced to wear prison garb "negate[s] the presence of compulsion necessary to establish a constitutional violation." 425 U.S. at 512-13. Thus, the OCCA's conclusion that

-24-

the Due Process Clause was not implicated by Ochoa's decision to proceed to trial in prison garb is entirely consistent with *Estelle*.

### ii. Evidence of Prior Criminal Convictions

Ochoa asserts he was denied a fundamentally fair mental retardation trial when the jury learned he had been convicted of a crime. In particular, he asserts information regarding the fact of his conviction is entirely irrelevant to the question of his mental retardation and the admission of that information is at odds with Oklahoma law.[13] The OCCA rejected this claim on the merits, concluding the very limited nature of the information conveyed to the jury (i.e., the mere fact Ochoa had been convicted of some type of crime) was consistent with Oklahoma law and did not prejudice Ochoa. *Ochoa*, 136 P.3d at 667 (cataloging limited

---

[13]In support of his assertion that the revelation to the jury of the fact of his conviction is at odds with Oklahoma law, Ochoa cites to the decision of the OCCA in *Lambert* describing the purpose of a mental retardation trial:

> The proceeding on remand is solely devoted to the question of Lambert's mental retardation. Both parties may call witnesses and present evidence bearing on mental retardation. Lambert's criminal conviction and death sentence are not relevant to this issue. The jury should not hear evidence of the crimes for which Lambert was convicted, unless particular facts of the case are relevant to the issue of mental retardation. Any such evidence should be narrowly confined to that issue. The jury should not hear evidence in aggravation or mitigation of the murders for which Lambert was convicted, or any victim impact evidence. The only issue is whether Lambert meets [Oklahoma's] definition for mental retardation. The jury shall be convened to discover whether Lambert can show it is more likely than not that he is mentally retarded.

71 P.3d at 31 (footnote omitted).

evidence before jury and concluding such evidence "does not create the prejudicial effect *Lambert* sought to avoid").

On appeal, Ochoa reasserts that the provision to the jury of this irrelevant and prejudicial evidence rendered his trial fundamentally unfair. In response, Oklahoma asserts this is solely a matter of state law and, therefore, not a proper subject for habeas relief. Oklahoma is correct in arguing "Federal habeas review is not available to correct state law evidentiary errors; rather it is limited to violations of constitutional rights." *Smallwood v. Gibson*, 191 F.3d 1257, 1275 (10th Cir. 1999). Thus, even assuming the admission of this evidence was inconsistent with state law, a proposition the OCCA conclusively rejected, that fact alone would not entitled Ochoa to habeas relief.

Nevertheless, when a state court admits evidence that is "so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). That is true without regard to whether the evidence was properly admitted pursuant to state law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). Oklahoma is correct, however, in asserting the limited criminal background evidence at issue in this

case was not so unduly prejudicial as to render Ochoa's mental retardation trial

fundamentally unfair. This court has examined the entire transcript of Ochoa's

mental retardation trial and concludes there is simply nothing in the limited

information conveyed to the jury about Ochoa's background that suggested to the

jury it should decide the case on any basis other than the facts adduced at trial

and the law as set out in the trial court's instructions. Furthermore, given that

Ochoa insisted on attending trial in prison garb, any potential for prejudice

flowing from the provision of the background evidence as to Ochoa's status as a

convicted criminal is de minimis. Because the evidence at issue here did not

render Ochoa's trial fundamentally unfair, the district court properly denied

Ochoa's request for habeas relief.

### iii. Shock Sleeve

Ochoa contends he was denied a fundamentally fair mental retardation

proceeding because he was forced to wear a shock sleeve during trial. In support

of this assertion, Ochoa relies on the Supreme Court's decision in *Deck v.*

*Missouri*, which held that "the Constitution forbids the use of visible shackles

during the penalty phase, as it forbids their use during the guilt phase, *unless* that

use is justified by an essential state interest—such as the interest in courtroom

security—specific to the defendant on trial." 544 U.S. 622, 624 (2005) (quotation

omitted). The OCCA resolved this issue on the merits on direct appeal,

concluding the trial court erred in requiring Ochoa to wear the shock sleeve but

-27-

the error was harmless. *Ochoa*, 136 P.3d at 669-70. In so doing, the OCCA specifically concluded the procedural protections animating the Supreme Court's decision in *Deck* applied to Oklahoma's system of holding jury trials to determine the issue of mental retardation. *Id.* at 669.[14] Nevertheless, the OCCA held Ochoa was not entitled to relief because (1) there was nothing in the record indicating the shock sleeve was visible to the jury and (2) Ochoa did "not claim the shock sleeve prevented him from physically or mentally assisting his counsel at the mental retardation hearing." *Id.* at 670.

The OCCA's resolution of this claim is neither contrary to nor an unreasonable application of *Deck*. As *Deck* makes clear, it is the potential impact

_____

[14]In this regard, the OCCA concluded as follows:

> Although Respondent admits [Oklahoma statutory law] is applicable to the use of a "shock sleeve," it argues the statute is inapplicable to this case because Ochoa was forced to wear the sleeve at a mental retardation jury trial after he had already been convicted. We do not agree. The application of [Oklahoma statutory law] logically extends to any fact-finding trial processes. As the Supreme Court found in *Deck*, a jury's observation of a defendant in visible restraints undermines its ability to weigh accurately all relevant considerations. It implies the defendant is dangerous and almost assuredly affects the jury's perception of the defendant's character. Although a defendant's dangerousness has nothing to do with a finding of mental retardation, speculation on the defendant's character based upon observation of visible restraints diverts the jury's attention from its fact-finding mission—in this case, its consideration of the evidence relevant to the determination of a defendant's mental retardation.

*Ochoa*, 136 P.3d at 669.

on the jury of visible restraints that implicates the fundamental fairness of a jury trial proceeding. 544 U.S. *passim* (focusing on the use of "visible" restraints); *see also United States v. McKissick*, 204 F.3d 1282, 1299 (10th Cir. 2000) (refusing to presume prejudice where defendants were forced to wear stun belts at trial, but belts were not visible to jurors); *United States v. Baker*, 432 F.3d 1189,1245–46 (11th Cir. 2005) (concluding district court's failure to justify shackling was not an abuse of discretion where, among other things, shackles were not visible to jurors); *Mendoza v. Berghuis*, 544 F.3d 650, 654 (6th Cir. 2008) ("*Deck*'s facts and holding . . . concerned only *visible* restraints at trial. The Supreme Court was careful to repeat this limitation throughout its opinion."). Ochoa does not challenge the OCCA's finding that the shock sleeve he was forced to wear during his mental retardation trial was not visible to the jury. Given that uncontested finding, which is in any event entitled to a presumption of correctness, 28 U.S.C. § 2254(e)(1), the OCCA's resolution of this claim is clearly consistent with *Deck*.[15]

---

[15]Ochoa asserts, in a perfunctory manner, that he was prejudiced by the forced use of the shock sleeve because "[s]hock sleeves have the effect of making the accused less spontaneous, less expressive, and more rigid than he otherwise would be. Jurors pick up on these things and wonder why certain things occur . . . ." Because Ochoa did not raise this assertion before the district court, we decline to consider the matter. *Rhine v. Boone*, 182 F.3d 1153, 1154 (10th Cir. 1999) (holding this court will generally not consider an issue raised for the first time on appeal). In any event, this assertion of prejudice is not supported by a single citation to authority or the record and is therefore forfeited. *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("The court will not consider

(continued...)

## C. Cumulative Error

Ochoa asserts that even if the individual errors identified above do not entitle him to relief, the cumulative impact of those errors rendered his mental retardation trial fundamentally unfair. *See Matthews v. Workman*, 577 F.3d 1175, 1195 n.10 (10th Cir. 2009) ("In the federal habeas context, the only otherwise harmless errors that can be aggregated are federal constitutional errors, and such errors will suffice to permit relief under cumulative error doctrine only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness." (quotation omitted)). Here the only demonstrated federal constitutional error is the decision to force Ochoa to wear a shock sleeve at trial. For those reasons set out above, the OCCA's determination that this particular error was harmless is neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. Because there are no additional constitutional errors to aggregate, Ochoa's cumulative error claim necessarily fails.

---

[15](...continued)
such issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." (quotation omitted)).

## V. CONCLUSION

For those reasons set out above, the order of the United States District Court for the Western District of Oklahoma denying Ochoa's § 2254 habeas petition is hereby **AFFIRMED**.

10-6088 - *Ochoa v. Workman*

**HARTZ**, Circuit Judge, concurring:

I am pleased to join Judge Murphy's fine opinion except for § IV(B)(2)(a)(ii), which states that Ochoa's procedural-irregularity claims are properly brought in a second-or-successive habeas petition because they are *Atkins* claims. In my view, they are proper habeas claims because they are timely and are not second or successive.

In our first opinion addressing Ochoa's death sentence, we held that his *Atkins* claim was a second-or-successive application but could proceed because it satisfied the stringent conditions for such applications set forth in 28 U.S.C. § 2244(b)(2). Although that holding was clearly correct, some language in the opinion is no longer good law. In particular, we said that "a request to add new claims after the district court has adjudicated a habeas action must be preceded by a motion to vacate under Rule 60(b) and that . . . § 2244(b) applies to the Rule 60(b) motion as if it were a stand-alone second or successive petition." *Ochoa v. Sirmons*, 485 F.3d 538, 540 (10th Cir. 2007). But an opinion by the United States Supreme Court two months later, *Panetti v. Quarterman*, 551 U.S. 930 (2007), explained that some subsequent habeas claims are not "second or successive" within the meaning of § 2244.

In *Panetti* the prisoner had already pursued one round of claims under § 2254 through denial of certiorari by the Supreme Court. After his execution date

was set, however, he pursued a second application under § 2254 contending that, under *Ford v. Wainwright*, 477 U.S. 399 (1986), he was incompetent to be executed because of mental illness. The Court, recognizing that it "has declined to interpret 'second or successive' as referring to all § 2254 applications filed second or successive in time, even when the later filings address a state-court judgment already challenged in a prior § 2254 application," *id*. at 944, held that the second-or-successive constraint on applications "does not apply to a *Ford* claim brought in an application filed when the claim is first ripe," *id*. at 947. As *Panetti* was recently described by its author, "[I]f the petitioner had no fair opportunity to raise the claim in the prior application, a subsequent application raising that claim is not 'second or successive,' and § 2244(b)(2)'s bar does not apply[, such as] where the claim was not yet ripe at the time of the first petition." *Magwood v. Patterson*, 130 S. Ct. 2788, 2805 (2010) (Kennedy, J., dissenting). This view of *Panetti* has the endorsement of not only the three other justices who joined Justice Kennedy's dissent but also three justices who joined the majority opinion in *Magwood*. *See* 130 S. Ct. at 2803 (Breyer, J., concurring). A later example provided by Justice Kennedy in his dissent is close in point to our case. He wrote: "[I]f the petitioner raises a claim in his second habeas petition that could not have been raised in the earlier petition—perhaps because the error occurred for the first time during resentencing—then the application raising the

-2-

claim is not 'second or successive' and § 2244(b)(2)'s bar does not apply." *Id*. at 2806.

As I understand Supreme Court doctrine, Ochoa's procedural-irregularity challenge to the conduct of his *Atkins* trial is not a second-or-successive claim because there is no way it could have been raised in his original § 2254 application. That trial did not take place until his original application was on appeal to this court. And the procedural-irregularity claim is not time-barred because the one-year limitations period did not begin to run until his *Atkins* trial, *see* 28 U.S.C. § 2244(d)(1)(D) (limitations period cannot begin before "the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence"), and the period was tolled during the state proceedings. This analysis is supported by the few circuit opinions that have applied *Panetti*. *See*, *e.g.*, *Stewart v. United States*, 646 F.3d 856 (11th Cir. 2011) (challenge to federal sentence raised after state convictions set aside); *Leal Garcia v. Quarterman*, 573 F.3d 214, 220–24 (5th Cir. 2009) (habeas claim based on recent presidential declaration). It is important to recognize that *Panetti* does not suggest that Ochoa's *Atkins* claim is not second or successive; although the claim is based on a Supreme Court decision that postdated his original application, the issue could have been raised from the outset. *See Leal Garcia*, 573 F.3d at 221–22 (*Panetti* does not apply just because the claim relies on a new decision). (I should also note that *Panetti* suggests that claims by state prisoners

-3-

challenging the execution of their sentences should be pursued under § 2254, rather than under 28 U.S.C. § 2241, as has been the rule in this circuit. *See Magwood*, 130 S. Ct. at 2805 (Kennedy, J., dissenting) (indicating that a state prisoner's challenge to failure to grant parole is an original application under § 2254); *In re Jones*, 652 F.3d 603 (6th Cir. 2010) (similar).)

Consequently, Ochoa's procedural-irregularity claims are properly before this court. It is unnecessary for us to engage in analyzing whether those claims are, in the words of the majority opinion, "based on *Atkins,*" a concept that eludes my grasp.